IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SCOTT CRANE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Case No. _____ |
| | § | |
| RAVE RESTAURANT GROUP, INC., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Scott Crane (hereinafter "Plaintiff" or "Crane") brings this his Original Complaint against Defendant Rave Restaurant Group, Inc. (hereinafter "Defendant" or "Rave" or the "Company") seeking relief for breach of contract, fraudulent inducement, and statutory fraud (the "Complaint"). Plaintiff pleads as follows:

### SUMMARY

1. Rave is a public company that owns more than 275 Pizza Inn® and Pie Five restaurants. Crane is its successful former CEO. Rave and its Chairman enticed Crane, a highly-regarded and experienced CEO, to join the Company with promises of stock and other benefits if certain performance benchmarks were met. When Crane not only met those benchmarks, but *exceeded* them, Rave pulled the rug out from underneath him, ignominiously terminating Crane without cause, all in an attempt to deprive him of what he earned – his shares in Rave.

2. Rave, its Chairman and its lawyers have thrown up myriad excuses to avoid transferring Crane his Rave shares, including that Crane failed to meet a condition precedent. But that same excuse was already rejected by the Fifth Circuit, who properly found such gameplaying unacceptable. *See Sellers v. Mineral Tech, Inc.,* 753 Fed. Appx. 272, 279 (5th Cir. 2018). It is

beyond dispute that Rave made impossible Crane's satisfaction of any condition precedent.  The Fifth Circuit was clear:  corporate actors cannot shirk their responsibilities to employees by engaging in a game of bait-and-switch.

3. This is not the first or only time Rave has pulled the same bait-and-switch.  Indeed, Rave has a pattern of promising employees bonuses, monies, and shares as part of their compensation, but then terminating those employees immediately prior to transferring the promised stock, all in order to avoid Rave's obligations.  To borrow a phrase from Rave's website, "any way you slice it" what happened to Crane and other employees was wrong, and Crane files suit to bring accountability and ensure that it does not happen again.

## PARTIES AND SERVICE

4. Plaintiff is an individual who resides in and is a resident of the State of Kansas.

5. Rave is a Missouri corporation whose principal place of business is located at 3551 Plano Parkway, The Colony, Texas 75056-5245, and may be served by and through its registered agent National Registered Agents, Inc. at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(2) because of complete diversity and the amount in controversy exceeds $75,000, excluding interest and costs.

7. Plaintiff resides and intends to remain in Wichita, Kansas.  Plaintiff is therefore a domiciliary of the State of Kansas.

8. Rave is incorporated in the State of Missouri.  Rave's principal place of business is 3551 Plano Parkway, The Colony, Denton County, Texas 75056-5245.  Rave is therefore a citizen of both Texas and Missouri.

9. There is, therefore, complete diversity among the parties.

10.     All of the acts or omissions that give rise to Plaintiff's claims occurred or accrued in Denton County, Texas, and therefore venue is proper in the Eastern District of Texas (Sherman Division).

## FACTS

**A.     Rave Searches for and Finds a Successful CEO.**

11.     In late 2016, Rave was actively searching for a chief executive officer ("CEO") to transform its two pizza restaurant brands Pizza Inn® and Pie Five Pizza into a new era of what is commonly referred to as "fresh fast casual."

12.     Crane had recently finished his tenure as the CEO of a fresh fast casual restaurant specializing in hamburgers.  He helped lead the company's development from a two-unit startup in 2007 to a global brand with ~370-plus locations.  At the pinnacle of his leadership, the fresh fast casual hamburger franchise was sold.

13.     In their efforts to recruit Crane, Crane was told that Rave's Chairman of the Board, Mark E. Schwarz ("Schwarz"), was interested in having Crane, and *only* Crane, fill the position as CEO of Rave.  Crane was told, in essence, that it was a beauty pageant of one.

14.     Before Rave extended an offer to take the helm as CEO, Crane only interviewed with Schwarz and another member of the board of directors, Clinton Coleman. Schwarz bragged that although Rave was a "publicly traded company," he was "the board [of directors for Rave]" and that Schwarz's "decision was Rave's decision."

15.     Schwarz, on behalf of Rave, offered Crane a salary with potential bonuses, as well as shares in Rave based on certain performance metrics.

16.     While the salary and bonuses were not nominal, the real attraction to the CEO job at Rave was the potential to earn shares in Rave, which Crane emphasized to Schwartz on multiple

occasions prior to accepting the position. The impetus for Crane accepting the position was the promised equity in Rave.

17. In announcing the hire, Schwarz said this about Crane: "Scott is dynamic leader with a proven track record of growth with success …"

**B.    Crane Goes to Work at Rave.**

18. Crane so believed in the fact that he would succeed in adding value to Rave that he *personally* purchased 400,000 shares in Rave, thereby becoming the third or fourth largest shareholder. As of the filing of this Complaint, Crane maintains his ownership of approximately 400,000 shares.

19. On or about January 9, 2017, Crane took over as CEO of Rave.

20. Schwarz was so anxious to get Crane started that he directed Rave to put Crane up at a corporate apartment until Crane could find suitable living arrangements near Rave's headquarters in The Colony, Texas.

21. Crane began working on both Rave restaurant brands contemporaneously.

22. At the inception of his tenure, Rave was short on cash and as a result: (a) making payroll payments were almost always in jeopardy; and (b) Rave was holding checks to vendors.

23. Crane was instrumental in fixing Rave's balance sheets by: (a) raising $5,000,000 in capital to give Rave much needed breathing room in terms of cash; and (b) selling company stores of Pizza Inn.

24. Crane was successful. At the close of January 5, 2017, two business days before announcing Crane's hire, Rave's stock was at $2.22 per share. At the close of July 15, 2019, a business day before the announcement of Crane's termination, Rave's stock was at $3.08 per share,

occasions prior to accepting the position. The impetus for Crane accepting the position was the promised equity in Rave.

17. In announcing the hire, Schwarz said this about Crane: "Scott is dynamic leader with a proven track record of growth with success …"

**B.    Crane Goes to Work at Rave.**

18. Crane so believed in the fact that he would succeed in adding value to Rave that he *personally* purchased 400,000 shares in Rave, thereby becoming the third or fourth largest shareholder. As of the filing of this Complaint, Crane maintains his ownership of approximately 400,000 shares.

19. On or about January 9, 2017, Crane took over as CEO of Rave.

20. Schwarz was so anxious to get Crane started that he directed Rave to put Crane up at a corporate apartment until Crane could find suitable living arrangements near Rave's headquarters in The Colony, Texas.

21. Crane began working on both Rave restaurant brands contemporaneously.

22. At the inception of his tenure, Rave was short on cash and as a result: (a) making payroll payments were almost always in jeopardy; and (b) Rave was holding checks to vendors.

23. Crane was instrumental in fixing Rave's balance sheets by: (a) raising $5,000,000 in capital to give Rave much needed breathing room in terms of cash; and (b) selling company stores of Pizza Inn.

24. Crane was successful. At the close of January 5, 2017, two business days before announcing Crane's hire, Rave's stock was at $2.22 per share. At the close of July 15, 2019, a business day before the announcement of Crane's termination, Rave's stock was at $3.08 per share,

or *72%* higher in just 30 months. At the close of January 3, 2020, just 3 days before filing this Complaint, Rave's stock was at $1.82 per share, or a *drop* of over 40% after Crane's termination.

25. For fiscal years 2016 and 2017, Crane and his executive team always met or exceeded the benchmarks set by Rave's board of directors, entitling Crane to bonuses and shares in Rave in addition to his salary.

26. Rave's fiscal year starts in July and ends in June of the next year. Shares earned during the fiscal year were to be transferred on or about October 15th of the year following the close of a fiscal year, and then vest two years thereafter. Hence, shares earned at the end of the 2016 fiscal year (ending June 2017) were to be transferred on or about October 15, 2019.

27. Crane met the benchmarks set for the 2016 fiscal year ending June 2017 and was entitled to receive 328,000 restricted shares in Rave, which should have been transferred to Crane on or about October 15, 2019.

28. Crane met the benchmarks for the 2017 fiscal year (ending June 2018) and was entitled to receive 300,000 restricted shares in Rave, which should be transferred to Crane on or about October 15, 2020.

29. Upon information and belief, Crane met the benchmarks for the 2018 fiscal year (ending June 2019) and was entitled to receive approximately 300,000 restricted shares in Rave, which should be transferred to Crane on or about October 15, 2021.

**C.  Schwarz terminates Crane to Avoid Transferring Him His Rave Shares.**

30. Although Crane earned shares in Rave by meeting and/or exceeding the benchmarks set by Rave's board of directors, according to Crane's contract with Rave, Rave would not transfer the 328,000 units of shares to Crane that he earned for fiscal year 2016 until on or about October 15, 2019.

31. In July 2019, approximately one (1) month after Crane had already reached the benchmarks Rave's board of directors set for him for fiscal year 2018 (ending June 2019), Schwarz personally terminated Crane, citing no cause for the termination.

32. When presented with a severance agreement that did *not* include the stock he earned and which precipitated him accepting the CEO position, Crane refused. Instead, Crane demanded that Rave do the right thing and give him the stock he earned, to which Schwartz coldly replied: "A contract is a contract". Crane told Schwartz he would not agree to any severance agreement (with an attendant release) unless this equity was included. Schwartz refused.

33. It was Schwarz's intention to terminate Crane to avoid transferring the shares in Rave, despite the fact Crane already earned the shares.

D. **Deep-Pocketed Schwarz Plays Hardball with Crane.**

34. When Crane expressed dissatisfaction with Schwarz's decision to terminate him and his refusal to transfer the shares Crane earned, Schwarz warned Crane not to pursue a claim against Rave by ominously stated that "there are two sides to every story and your net worth is going to be far less than it is today if you try to pursue this."

35. Additionally, Schwarz promised to manufacture a "counterclaim" *only* if Crane brought a lawsuit against Rave, irrespective of whether such a "counterclaim" had any merit whatsoever. Consequently, Crane fully expects Rave to file a frivolous counterclaim in fulfillment of Schwarz's threat to Crane soon after Rave receives service of this Complaint.

36. Indeed, only after Crane refused to sign a severance agreement (and release), did Schwartz started inventing or exaggerating "issues" while Crane was CEO. This is a cynical and naked attempt to create "downside" risk for Crane having the temerity to demand what he earned for his hard work at Rave. It will not work; Crane will not be bullied.

37. Rave failed and/or refused to transfer the shares Crane earned during his tenure as CEO and indicated that it will not transfer those hard-earned shares to Crane. Additionally, Rave refused to pay Crane the bonus he is entitled to for reaching the benchmarks for the 2018 Fiscal Year (ending June 2019), earned but unpaid vacation, $300,000 in severance pursuant to Crane's employment contract because he was not terminated with cause, and COBRA premium payments.

E. **Crane is not Alone.**

38. After Crane's termination, Rave terminated an additional 11 employees, some of whom were also entitled to equity in Rave. These employees included five to six executives, five to six directors, sales, and administrative staff.

39. Notably and upon information and belief, Rave refused to honor many of its commitments to those employees by refusing to, among other things, transfer the shares in Rave each of those former employees earned during their tenure at Rave.

40. Upon information and belief, Rave never intended to honor its promise of granting shares to Crane or its other employees.

## COUNT 1 – BREACH OF CONTRACT

41. Crane's employment contract with Rave is a valid and enforceable contract (the "Employment Contract").

42. As a party to the Employment Contract, Crane is a proper party to bring suit for breach of the Employment Contract.

43. Crane performed, tendered performance of, or was excused from performing his contractual obligations under the Employment Contract.

44. Rave breached the Employment Contract by, among other things, failing to transfer 328,000 shares in Rave to Crane on or about October 15, 2019, failing to pay Crane the bonus he

was entitled to receive as a result of meeting the benchmarks for the 2018 fiscal year (ending June 2019), $300,000 in severance due to Crane's termination without cause, earned and accrued bonus and vacation, as well as COBRA premium payments.

45. Failure to transfer the shares of stock in Rave caused Crane to be damaged in the amount of $846,240.00 (based on Rave's stock price of $2.58 per share as of October 15, 2019 – the day Rave was required to deliver the shares to Crane).

46. Crane requests the Court award him the 328,000 shares of Rave through the equitable remedy of specific performance.

## COUNT 2 – FRAUDULENT INDUCEMENT

47. In the alternative to his claim for breach of contract and declaratory judgment, Crane asserts a claim for fraudulent inducement.

48. In accordance with Rule 9(b) and Fifth Circuit caselaw, *e.g. Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.,* 759 F. App'x 280, 286–87 (5th Cir. 2019), Crane provides the following with regard to his fraud claim:

   a. <u>Time (Place)</u>: 12/2/16 (Crescent Court, Dallas, Texas); 12/21/16 (Shanahan's Restaurant and private plane terminal, Denver, Colorado);

   b. <u>Contents</u>: If Crane reached certain benchmarks in his performance as CEO, Crane would receive, among other consideration, shares in Rave.

   c. <u>Identity of Person Making the Misrepresentation</u>: Schwartz, acting in his capacity as, and in the course and scope of, his position as chairman of the board of Rave's board of directors;

   d. <u>What Rave Obtained Thereby</u>:  Crane agreed to accept the CEO position and Rave received Crane's valuable services which resulted in Rave meeting and exceeding its benchmarks.

49. Schwartz's representation that Crane would be awarded shares in Rave if he met certain benchmarks in his performance as CEO was a material representation as it was a key factor in Crane's decision to take the position as CEO at Rave, as evidenced by Crane informing Schwartz on multiple occasions prior to accepting the CEO position that the *only* reason why Crane was interested in taking the CEO position was the opportunity to earn equity in Rave.  Crane would not have accepted the position of CEO "but for" Schwartz' representations that Crane would receive equity in Rave if he met certain benchmarks.

50. Schwartz's representation that Crane would be awarded shares if he reached certain benchmarks in his performance as CEO was false as Crane met or exceeded the benchmarks set for him for the 2016 fiscal year (ending June 2017), but Rave failed to transfer shares in Rave to Crane on or about October 15, 2019.

51. Schwartz knew the representation that Rave would transfer shares to Crane if certain benchmarks were met was false, or Schwartz made the representation recklessly, as a positive assertion, and without knowledge of its truth.

52. Schwartz made the representation to Crane intending for Crane to rely on Schwartz's representation that Crane would receive shares in Rave if Crane met certain benchmarks as CEO of Rave in order to induce Crane into entering into the Employment Contract with Rave, and Schwartz knew that Crane only took the CEO position at Rave because Crane could earn equity in Rave because Crane had told Schwartz of this fact multiple times on multiple separate occasions prior to accepting the CEO position at Rave.

53. Crane relied on Schwartz's representation and worked tirelessly to achieve the benchmarks set by the board of directors for Rave, and did, in fact, achieve or surpass said benchmarks which entitled Crane to receive approximately 928,000 shares in Rave (328,000 shares for fiscal year 2016; 300,000 shares for fiscal year 2017; and approximately 300,000 shares for fiscal year 2018).

54. Because Crane has not received the 328,000 shares in Rave which Crane earned by meeting and/or surpassing the benchmarks for the 2016 fiscal year (ending June 2017), Crane has been damaged in an amount not less than $846,240.00 based on the share price of Rave on October 15, 2019 (the date Rave should have transferred the 328,000 shares to Crane).

### COUNT 3 – STATUTORY FRAUD

55. In the alternative to his claim for breach of contract and declaratory judgment, Crane asserts a claim for statutory fraud pursuant to Texas Business and Commerce Code §27.01, as Rave engaged in fraud in a transaction involving stock in a corporation.

56. In accordance with Rule 9(b) and Fifth Circuit caselaw, *e.g. Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.,* 759 F. App'x 280, 286–87 (5th Cir. 2019), Crane provides the following with regard to his fraud claim:

   a. <u>Time (Place)</u>: 12/2/16 (Crescent Court, Dallas, Texas); 12/21/16 (Shanahan's Restaurant and private plane terminal, Denver, Colorado);

   b. <u>Contents</u>: If Crane reached certain benchmarks in his performance as CEO, Crane would receive, among other consideration, shares in Rave;

   c. <u>Identity of Person Making the Misrepresentation</u>: Schwartz, acting in his capacity as, and in the course and scope of, his position as chairman of the board of Rave's board of directors;

   d. <u>What Rave Obtained Thereby</u>:  Crane agreed to accept the CEO position and Rave received Crane's valuable services which resulted in Rave meeting and exceeding its benchmarks.

57. Schwartz's representation that Crane would be awarded shares in Rave if he met certain benchmarks in his performance as CEO was a material representation as it was a key factor in Crane's decision to take the position as CEO at Rave, as evidenced by Crane informing Schwartz on multiple occasions prior to accepting the CEO position that the only reason why Crane was interested in taking the CEO position was the opportunity to earn equity in Rave.  Crane would not have accepted the position of CEO "but for" Schwartz' representations that Crane would receive equity in Rave if he met certain benchmarks.

58. Schwartz's representation that Crane would be awarded shares if he reached certain benchmarks in his performance as CEO was false as Crane met or exceeded the benchmarks set for him for the 2016 fiscal year (ending June 2017), but Rave failed to transfer shares in Rave to Crane on or about October 15, 2019.

59. Schwartz knew the representation that Rave would transfer shares to Crane if certain benchmarks were met was false, or Schwartz made the representation recklessly, as a positive assertion, and without knowledge of its truth.

60. Schwartz made the representation to Crane intending for Crane to rely on Schwartz's representation that Crane would receive shares in Rave if Crane met certain benchmarks as CEO of Rave in order to induce Crane into entering into the Employment Contract with Rave, and Schwartz knew that Crane only took the CEO position at Rave because Crane could earn equity in Rave because Crane had told Schwartz of this fact multiple times on multiple separate occasions prior to accepting the CEO position at Rave.

61. Crane relied on Schwartz's representation and worked tirelessly to achieve the benchmarks set by the board of directors for Rave, and did, in fact, achieve or surpass said benchmarks which entitled Crane to receive approximately 928,000 shares in Rave (328,000 shares for fiscal year 2016; 300,000 shares for fiscal year 2017; and approximately 300,000 shares for fiscal year 2018).

62. Because Crane has not received the 328,000 shares in Rave which Crane earned by meeting and/or surpassing the benchmarks for the 2016 fiscal year (ending June 2017), Crane has been damaged in an amount not less than $846,240.00 based on the share price of Rave on October 15, 2019 (the date Rave should have transferred the 328,000 shares to Crane).

### COUNT 4 – DECLARATORY JUDGMENT

63. In the alternative to his claim of fraudulent inducement, Crane hereby requests the Court enter a declaratory judgment.

64. Crane is a party to the Employment Contract and he seeks the Court enter a judgment construing the terms and provisions of said Employment Contract as provided by the Texas Uniform Declaratory Judgments Act. Tex. Civ. Prac. & Rem. Code §37.001 et seq.

65. Although Crane believes Rave has breached the Employment Contract by failing to transfer 328,000 shares of stock in Rave to Crane, Crane is still entitled to have this Court determine whether Crane is entitled to the approximately 600,000 in additional shares of stock Crane earned by meeting and/or surpassing the benchmarks for the fiscal years 2017 and 2018 at Rave. *See* Tex. Civ. Prac. & Rem. Code §37.004(b).

66. Crane requests this Court enter a judgment that Crane is entitled to the approximately 600,000 additional shares of stock in Rave which Crane earned by meeting and/or surpassing the benchmarks for the fiscal years 2017 and 2018 at Rave.

67. Rave made false representations to Crane with actual awareness of the falsity. Under Texas Business and Commerce Code § 27.01, Rave's actual awareness may be inferred from its objective manifestations that indicate Rave acted with actual awareness. For example, Rave's previous and similar actions vis-à-vis other employees in promising and inducing employment with stock, and then refusing to award the stock on the eve of the award

## JURY DEMAND

68. Crane hereby demands a trial by jury of all issues so triable by applicable law, including but not limited to Federal Rule of Civil Procedure 38.

## CONDITIONS PRECEDENT

69. All conditions precedent to all relief being sought by Plaintiff have been met, performed, occurred, and/or waived.

## RESERVATION OF RIGHTS

70. The right to bring additional causes of action and to amend this complaint, as necessary, is specifically reserved.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court enter a judgment in favor of Plaintiff Scott Crane against Defendant Rave Restaurant Group, Inc. as follows:

1. Specific performance of the Employment Contract by transfer of 328,000 shares of stock in Rave to Scott Crane;

2. a declaratory judgment that Scott Crane is entitled to 600,000 additional shares of stock in Rave Restaurant Group, Inc. because he met or exceeded the benchmarks set forth by the board of directors for Rave Restaurant Group, Inc. for fiscal years 2017 and 2018;

3. $300,000 in severance due to Crane's termination without cause, earned and accrued bonus and vacation, as well as COBRA premium payments;

4. reasonable attorney's fees;

5. all costs of court; and

6. such other and further relief, whether at law or in equity, to which Plaintiff has shown himself entitled.

Or, in the alternative, enter a judgment in favor of Scott Crane against Rave Restaurant Group, Inc. as follows:

1. actual damages in the amount of $2,394,332.80 for common law fraud or statutory fraud;[1]

2. exemplary damages in an amount to be determined by the trier of fact;

3. pre-judgment interest at the highest rate allowed by law from October 15, 2019 until the date of judgment;

4. post-judgment interest at the highest rate allowed by law from the date of judgment until paid in full;

---

[1] ~928,000 shares x. $2.5801 share price as of October 15, 2019

5. reasonable attorney's fees, expert witness fees, and deposition costs;

6. costs of court; and

7. and such other and further relief, whether at law or in equity, to which Plaintiff Scott Crane has shown himself entitled.

Respectfully submitted,

*/s/ Brian P. Shaw*

**R. ROGGE DUNN**
Texas Bar No. 06249500
Email: rdunn@roggedunngroup.com
**JOSHUA J. IACUONE**
Texas Bar No. 24036818
Email: iacuone@roggedunngroup.com
**BRIAN P. SHAW**
Texas Bar No. 24053473
E-mail: shaw@roggedunngroup.com

**ROGGE DUNN GROUP PC**
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Telephone: 214.888-5000
Facsimile: 214.220.3833

**ATTORNEYS FOR PLAINTIFF SCOTT CRANE**