IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SCOTT CRANE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-00013 |
| | § | |
| RAVE RESTAURANT GROUP, INC., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT RAVE RESTAURANT GROUP INC.'S
MOTION FOR SUMMARY JUDGMENT ON THRESHOLD CONTRACTUAL ISSUES
WITH SUPPORTING BRIEF**

W. Gary Fowler
Texas State Bar No. 07329250
Scott M. McElhaney
Texas State Bar No. 00784555
**JACKSON WALKER L.L.P.**
2323 Ross Avenue, Ste. 600
Dallas, Texas 75201
(214) 953-6000 (office)
(214) 953-5822 (facsimile)
gfowler@jw.com
smcelhaney@jw.com

**ATTORNEYS FOR DEFENDANT
RAVE RESTAURANT GROUP, INC.**

## TABLE OF CONTENTS

**Page**

I.     STATEMENT OF ISSUES TO BE DECIDED ...................................................2

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................3

    A.   Crane's Employment with Rave as its CEO and His January 6, 2017, Agreement....................................................................................................3

    B.   January 2017: Rave Grants Crane an RSUA Agreement During Its FY2017 Tied to Rave's Financial Performance During Its FY2019. .....................4

    C.   August 2017: Rave Pays Crane the Contractually-Agreed FY2017 Bonus. ...........8

    D.   December 2017: Rave Grants Crane an RSUA Agreement During Its FY2018 Tied to Rave's Financial Performance During Its FY2020. .....................8

    E.   September 2018: Rave's Annual Bonus Payments to Crane for FY2018. ..............9

    F.   Rave Did Not Grant Any RSUA Agreements During Its FY2019. ........................9

    G.   July 2019: Crane's Employment with Rave is Terminated. ..................................10

    H.   Crane Refuses to Sign Rave's Form of Release Required for Severance Pay.........................................................................................................................10

III.   ARGUMENT AND AUTHORITY ...............................................................10

    A.   Standard of Review..............................................................................................10

    B.   Crane's Contractual Claims For Rave Stock Fail as a Matter of Law..................11

        1.   Crane's Termination Before Any Vesting Date Precludes Any Recovery. ...............................................................................................11

            a.   Under Texas Law, Any Unvested Right to Rave Stock Was Forfeited.......................................................................................12

            b.   Parties Agreed to What Would Happen Upon Termination. .........14

            c.   Crane's Cannot Escape the RSUA Agreements' Forfeiture Provision. .....................................................................................14

        2.   Crane Cannot Prevail on a Claim for Rave Stock Tied to FY2021 Financial Results Because He Did Not Receive an RSUA Agreement Tied to That Year. .................................................................16

C.      The Contract Claim for Failure to Pay Bonuses Similarly Fails as a Matter of Law. ...................................................................................................16

D.      Summary Judgment is Proper on Crane's Contract Claim for Unpaid Vacation. ......................................................................................................18

E.      Crane Claim for Severance Pay or COBRA Premiums Fails as a Matter of Law. ......................................................................................................19

F.      Summary Judgment is Proper on Crane's Fraudulent Inducement Claim............20

        1.      Crane Disclaimed Reliance on Matters Before the Employment Agreement. ...............................................................................20

        2.      Crane Cannot Establish the Reliance Element of a Fraud Claim. .............21

        3.      Crane Cannot Show That Rave Had No Intention of Performing Under the Employment Agreement. ..........................................22

        4.      Crane Cannot Show Causation of an Injury. ............................................23

G.      The Statutory Fraud Claim Should Also Be Dismissed........................................23

IV.    CONCLUSION................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Durant*,
  550 S.W.3d 605 (Tex. 2018)....................................................................................21, 22, 24

*Austin v. Kroger Tex., L.P.*,
  864 F.3d 326 (5th Cir. 2017) ...............................................................................................12

*Authier v. Automated Logic Consult. Servs.*,
  No. 5:14-cv-993, 2016 U.S. Dist. LEXIS 98513 (W.D. Tex. July 28, 2016)..............14, 15, 17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................................................................12

*Doherty v. Am. Home Prod. Corp.*,
  No. 99-9533, 2000 U.S. App. LEXIS 14166 (2d Cir. June 15, 2000)....................................17

*Epps v. Fowler*,
  351 S.W.3d 862 (Tex. 2011)...............................................................................................14

*Ginn v. NCI Bldg. Sys., Inc.*,
  472 S.W.3d 802 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ..........................................24

*Hardwick v. Smith Energy Co.*,
  500 S.W.3d 474 (Tex. App.—Amarillo 2016, pet. dism'd by agr.) ........................................24

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*,
  892 F.3d 719 (5th Cir. 2018) ...............................................................................................13

*Lewis v. Vitol, S.A.*,
  No. 01-05-00367-CV, 2006 Tex. App. LEXIS 5645 (Tex. App.—Houston
  [1st Dist.] 2006, no pet.) ......................................................................................................19

*Mercedes-Benz USA, LLC v. Carduco, Inc.*,
  583 S.W.3d 553 (Tex. 2019)................................................................................................23

*Nichols v. Enterasys Networks, Inc.*,
  495 F.3d 185 (5th Cir. 2007) ...............................................................................................18

*O'Grady v. Gerald D. Hines, Inc.*,
  683 S.W.2d 763 (Tex. App.—Houston [14th Dist.] 1984, no writ) ........................................20

*Oldham v. ORIX Fin. Servs.*,
  No. 3:05-cv-2361, 2007 U.S. Dist. LEXIS 11855 (N.D. Tex. Feb. 21, 2007) .................18, 20

*Pride Int'l, Inc. v. Bragg*,
259 S.W.3d 839 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ...........................................19

*Ryan v. Superior Oil Co*.,
813 S.W.2d 594 (Tex. App.—Houston [14th Dist.] 1991, writ denied).................................20

*Sawyer v. E. I. du Pont de Nemours & Co*.,
430 S.W.3d 396 (Tex. 2014)..................................................................................................23

*Sellers v. Minerals Techs., Inc.*,
753 Fed. Appx. 272 (5th Cir. 2018)..........................................................................1, 16, 17

*Skelton v. Mobile Sys. Int'l, Inc*.,
No. 3:98-cv-1254, 2000 U.S. Dist. LEXIS 4725 (N.D. Tex. Apr. 14, 2000) ...................15, 17

*Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*,
184 S.W.3d 840 (Tex. App.—Austin 2006, pet. dism'd by agr.).............................................22

*Wilson v. Noble Drilling Servs., Inc.*,
405 Fed. Appx. 909 (5th Cir. 2010)..........................................................................14, 17, 19

**Statutes**

Texas Business and Commerce Code § 27.01 .............................................................................24

**Other Authorities**

Fed. R. Civ. P. 56(c) ..................................................................................................................12

Fed. R. Civ. P. 56(e) ..................................................................................................................12

Plaintiff Scott Crane, a former CEO of Defendant Rave Restaurant Group, Inc. ("Rave"), seeks to enforce a deal that (a) he never made and (b) contradicts the unambiguous contracts he signed. Crane's January 6, 2017, Employment Agreement specifically allowed Rave to discharge him without cause and, in exchange, made a $300,000 severance payment available, if he signed a release of all claims against Rave. In July of 2019, Rave discharged Crane without invoking cause and tendered a release for the severance, but Crane refused to sign. Instead, betting he could bait this Court into giving him a different deal, he seeks shares of Rave stock through separate Restricted Stock Unit Award ("RSUA") Agreements, bonuses, vacation pay, COBRA payments, and the severance pay (but without giving the required release). Crane's claims, however, are directly contrary to the express terms of his negotiated agreements and should be dismissed.

● The stock units Crane received under his RSUA Agreements were undeniably "unvested" when he was discharged. Unlike the parties in *Sellers v. Minerals Techs., Inc.*, 753 Fed. Appx. 272 (5th Cir. 2018) (the case Crane stakes his case on), Crane and Rave specifically agreed in the RSUA Agreements that, on a termination without cause, unvested units remained unvested and were forfeited. Texas law requires enforcement of that agreement. For such a termination, the parties separately negotiated severance pay upon the signing of a release.

● The claims for annual bonuses fare no better. Such bonuses were discretionary, and under Texas law, Crane thus cannot show that Rave has a contractual obligation to pay. The Employment Agreement also said Crane had to be employed until Rave's annual financial audit in order to be paid a bonus for the year, but Crane was discharged well before the relevant times.

● Crane's claim for vacation pay likewise fails. His Employment Agreement says Rave could "modif[y], reduce[] or eliminate[]" and also "revise" benefits such as vacation at Rave's "sole discretion." The Rave Employee Handbook contains similar language. Under Texas law, the effect of such language is that Crane has no contractual entitlement to vacation pay.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– Page 1**

● The claim for COBRA and severance pay fails as well. The Employment Agreement required Crane to sign a release on a form acceptable to Rave to receive these benefits. He refused to do so. Crane wants to have his cake and eat it too, but that is not the law.

● Finally, Crane asserts he was fraudulently induced into accepting employment at Rave in January of 2017 with the promise of the availability of Rave stock under RSUA Agreements. But Crane could not have reasonably relied on any representation that he would receive Rave stock; there is no evidence that, when entered into, Rave had no intention of performing any obligations it undertook; and requirements for vesting were not met. Finally, Crane's claim under Texas' statutory fraud statute fails because that statute does not apply here.

## I.      STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Crane has a contractual entitlement to the Rave stock he seeks, where the restricted stock units he received were "unvested" when he was discharged and the RSUA Agreements required their forfeiture upon the termination of his employment.

2.      Whether Crane has a contractual entitlement to the bonuses he seeks, where (a) any bonus award was discretionary and (b) Crane was not employed on the date on which he had to be employed in order to receive the bonuses he seeks.

3.      Whether Crane has an entitlement to the vacation pay he seeks, where Rave could "modif[y], reduce[] or eliminate[]" and also "revise" benefits such as vacation at its "sole discretion," and the existence of such language precludes the formation of a contractual obligation.

4.      Whether Crane has an entitlement to COBRA and severance payments, where he refused to sign the release required to receive such benefits.

5.      Whether Crane can prevail on his claims that Rave fraudulently induced him into accepting employment at Rave with the promise of the availability of Rave stock under RSUA Agreements, where (a) Crane could not have reasonably relied on any representation that he would

receive Rave stock, (b) there is no evidence that, when entered into, Rave had no intention of performing under the Employment Agreement, (c) the continuous service requirements for vesting were not met, and (d) a statutory fraud claim cannot be based on an agreement like the RSUA Agreements, which only granted an unvested interest in stock.

## II.      STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      Crane's Employment with Rave as its CEO and His January 6, 2017, Agreement.

Rave is a publicly traded corporation that is the home of two restaurant concepts: Pie Five Pizza, a leading fast casual pizza company, and Pizza Inn, one of the country's first dine-in pizza chains. *See* Declaration of Mark E. Schwarz ¶ 2 (Tab A).

During November and December of 2016, Rave representatives and Crane held various discussions about Crane becoming Chief Executive Officer of Rave and the terms and conditions of Crane's potential employment in that role. *See id*. at ¶ 3.

In that process, on December 7, 2016, the Chairman of Rave's Board of Directors, Mark Schwarz, sent Crane an email attaching certain documents relating to a proposed compensation package for Crane. *Id*. at ¶ 4 & Ex. 1. The attachments to that email included an initial draft of an offer letter as well as (a) a blank form of an RSUA Agreement and (b) a copy of the Pizza Inn Holdings, Inc. 2015 Long Term Incentive Plan ("2015 LTIP") under which RSUA Agreements were granted. (Rave was formerly known as Pizza Inn Holdings, Inc.) *See id.* at Exs. 2-4.

After negotiating various changes to the initial draft employment agreement, Crane accepted the offer to become Rave's CEO. Crane signed the employment agreement with Rave on January 6, 2017. Rave announced Crane's appointment on January 9, 2017. *Id.* at ¶ 5 & Ex. 5.

As discussed in detail below, the January 6, 2017, employment agreement ("Employment Agreement") addressed, among other things, (a) Crane's annual salary ($400,000), (b) long term incentive compensation through separate RSUA Agreements, (c) annual incentive compensation

through an annual bonus opportunity, (d) employee benefits such as vacation, and (e) severance

payments in the case of termination under various situations. *Id.*

In the Employment Agreement, Crane also expressly agreed that "[a]ny representations

that may have been made to [him] concerning the terms and conditions of employment, whether

orally or in writing, are cancelled and superseded by this letter." *Id.* at Ex. 5, p. 8.

**B.      January 2017: Rave Grants Crane an RSUA Agreement During
          Its FY2017 Tied to Rave's Financial Performance During Its FY2019.**

The "Long Term Incentive Compensation" paragraph of the January 6, 2017, Employment

Agreement addressed Restricted Stock Unit awards. That paragraph states in full as follows:

> As additional consideration for the duties and responsibilities to be performed, you will be
> eligible to participate in the Long Term Incentive Plan (the "LTIP"), which currently consist of
> Restricted Stock Unit (RSU) awards with 3-year performance and time vesting criteria, as
> determined by the Company's Compensation Committee each year. Upon your start date
> with the Company, you will be granted 300,000 Restricted Stock Units. The terms and
> conditions associated with the RSUs are detailed in a separate Restricted Stock Unit Award
> Agreement. You shall be eligible for additional LTIP awards following each full fiscal year that
> you are employed by the Company, subject to approval of the Compensation Committee.

*See* Schwarz Decl. at Ex. 5, pp. 2-3.

Pursuant to the January 6, 2017, Employment Agreement's provision for a grant of 300,000

Restricted Stock Units on his start date, Crane and Rave executed a "Restricted Stock Unit Award

Agreement" dated January 12, 2017. *See* Schwarz Decl. at ¶ 6 & Ex. 6.

Rave's fiscal year generally runs from July of one year through June of the following year.

Thus, for example, Rave's fiscal year 2017 ("FY2017") ran from July of 2016 through June of

2017. *See id.* at ¶ 7. The RSUA Agreement Crane received on January 12, 2017, immediately after

he stared as CEO, was thus granted during the third quarter of Rave's FY2017. *Id.*

The cover of the RSUA Agreement explained that it granted Crane 300,000 "Units" with

a "Vesting Date" of "October 15, 2019" and noted certain "Performance Criteria":

**RAVE RESTAURANT GROUP, INC.**
**RESTRICTED STOCK UNIT AWARD AGREEMENT**

To:    Scott Crane

      Rave Restaurant Group, Inc. (the "Company") grants to you (the "Participant") restricted stock units ("Units"), as follows:

| | |
|---|---|
| **Date of Grant:** | January 12, 2017 |
| **Units Granted:** | 300,000 |
| **Vesting Date:** | October 15, 2019 |
| **Performance Criteria:** | As set forth in Exhibit A hereto |

*Id.* at Ex. 6, p. 1. The RSUA Agreement also stated (a) that attached Terms and Conditions comprise an integral part of the RSUA Agreement, (b) that the RSUA Agreement was also subject to the terms of the Pizza Inn Holdings, Inc. 2015 Long Term Incentive Plan ("2015 LTIP"), and (c) that the Rave Board Compensation Committee would administer the RSUA Agreement and "any decision of the Committee will be final and conclusive":

> The attached Terms and Conditions comprise an integral part of this Restricted Stock Unit Award Agreement (this "Agreement"), and the Units granted hereby are subject to such Terms and Conditions. The Units are granted pursuant to and subject to all of the terms and conditions of the Pizza Inn Holdings, Inc. 2015 Long Term Incentive Plan, as now or hereafter amended (the "2015 LTIP"). The Compensation Committee of the Company's Board of Directors (the "Committee") will administer this Agreement and any decision of the Committee will be final and conclusive. Terms not defined herein have the meanings provided in the 2015 LTIP.

*Id.* Crane signed the RSUA Agreement, specifically agreeing "to be bound by the provisions of [the] Agreement and the 2015 LTIP":

> By your signature below, you agree to be bound by the provisions of this Agreement and the 2015 LTIP.
>
> RAVE RESTAURANT GROUP, INC.
>
> By: _____
>      Mark E. Schwarz, Executive Chairman
>
> PARTICIPANT:
>
> _____
> Scott Crane

The attached Terms and Conditions of the RSUA Agreement first defined what a "Unit" was and how it could become a share of Rave Stock. In a section entitled "Grant of Restricted Stock Units," the RSUA Agreement Terms and Conditions explained that a "Unit" represented a future "right to receive one share" of Rave common stock, but only subject to satisfaction of the "vesting schedule, performance criteria, and other terms and conditions":

> 1.    Grant of Restricted Stock Units.
>
>        Subject to the terms and conditions of the 2015 LTIP, the Company has granted to Participant the number of Units indicated in this Agreement.  Each Unit so granted represents the right to receive one share (or percentage thereof in accordance with the achievement of the performance criteria provided in Exhibit A hereto) of the common stock, $0.01 par value per share, of the Company (the "Common Stock"), subject to satisfaction of the vesting schedule, performance criteria and other conditions set forth herein.

*Id.*, p. 2. The Terms and Conditions then explained, in a section entitled "Vesting," that vesting required (a) Crane to remain continuously employed through the Vesting Date—i.e., October 15, 2019—and (b) certain company financial performance targets to be met:

> 2.    Vesting.
>
>        The Units will become fully vested and nonforfeitable if (i) Participant remains continuously employed by the Company through the Vesting Date indicated in this Agreement, or vesting is accelerated as provided herein, and (b) the number of Units to be vested pursuant to the performance criteria set forth in Exhibit A is greater than zero.

*Id.* In the "Performance Criteria" section, the Terms and Conditions also noted that the number of units that vest and thus become issuable shares would be determined by the Compensation Committee based on financial performance targets set out on a separate exhibit:

> 3.    Performance Criteria.
>
>        The number of shares issuable with respect to each Unit shall be determined by the Committee based on the performance criteria set forth in Exhibit A hereto.

*Id.* That attached Exhibit A said that (a) the performance criteria would be measured against Rave's FY2019 financial performance and (b) Rave's performance relative to the criteria would be determined by the Compensation Committee:

<div style="border:1px solid">

**EXHIBIT A**

**PERFORMANCE CRITERIA**

2.  For purposes of determining the vesting of the Units granted by this Agreement, the Performance Criteria shall be measured based upon the Company's actual performance in the fiscal year ended in June 2019 (the "Measurement Year"). The Company's actual financial performance in the Measurement Year relative to each Performance Criteria will determine the percentage of the number of Units related to such Performance Criteria that shall vest (the "Vesting Percentage"). The Committee shall determine the Vesting Percentages and may, in its sole discretion, consider the adjustment of the Company's results or the Performance Targets to reflect unusual, non-recurring, or unforeseen events, including impairment charges, asset disposals, acquisitions, and changes in accounting methodologies.

</div>

*Id.*, p. 5.

And, in section 4 of the Terms and Conditions, entitled "Delivery of Shares," the RSUA Agreement then explained how any ultimately issued shares of stock would be delivered. *Id.*, p. 2.

Significantly, section 5 of the RSUA Agreement's Terms and Conditions, entitled "Forfeiture of Units," explained that "[a]ll unvested Units will be forfeited in the event [Crane] cease[d] to be an employee of [Rave] before the Vesting date ***for any reason***," with exceptions for various events which did not occur here:

<div style="border:1px solid">

5.    Forfeiture of Units.

    All unvested Units will be forfeited in the event the Participant ceases to be an employee of the Company before the Vesting Date for any reason other than (i) the employee's retirement from employment at or after Retirement Age (as defined in Section 14 of the 2015 LTIP), (ii) the employee's death or total and permanent disability (as defined in Section 15 of the 2015 LTIP), or (iii) the Committee otherwise determines, in its sole discretion, that such Units should not be forfeited. If Participant ceases to be an employee of the Company before the Vesting Date under any of the circumstances set forth in clauses (i)-(iii) of the preceding sentence, then the number of Units indicated in this Agreement will be vested on a pro rata basis based on the number of full months from the Award Date until the Vesting Date which have elapsed as of the date of termination. In such event, the Company will deliver shares of its Common Stock to the Participant promptly following the otherwise applicable Vesting Date, subject to Section 13 below.

</div>

*Id.*, p. 3 (emphasis added). Finally, another section of the Terms and Conditions confirmed that the Agreement did not "confer upon [Crane] any right to remain in the employ of" Rave:

<div style="border:1px solid">

10.    No Rights of a Stockholder or of Continued Employment.

    Participant shall not have any of the rights of a stockholder of the Company with respect to Units except to the extent that one or more certificates for shares of the Common Stock shall have been delivered to Participant, or Participant has been determined to be a stockholder of record by the Company's transfer agent, upon satisfaction of the vesting schedule, performance criteria and other conditions set forth herein. Further, nothing herein shall confer upon Participant any right to remain in the employ of the Company.

</div>

*Id.*, p. 4.

The requirement of forfeiture of unvested units is consistent with (and mandated by) the 2015 LTIP, which required "immediate forfeit[ure of] all unvested restricted stock units" if a grantee ceased to be an employee "for any reason," with the inapplicable exceptions noted:

> (c)    Unless otherwise determined by the Committee, if an employee to whom restricted stock units have been awarded ceases to be an employee of the Corporation or of a subsidiary prior to vesting of all such restricted stock units and the satisfaction of any other conditions prescribed by the Committee for any reason other than death, total and permanent disability (as defined in Section 15 hereof), or retirement from employment at or after the Retirement Age, the employee shall immediately forfeit all unvested restricted stock units.

*See id.* at Ex. 4, p. 12 (2015 LTIP § 14(c)).

## C.    August 2017: Rave Pays Crane the Contractually-Agreed FY2017 Bonus.

The January 6, 2017, Employment Agreement provided that Crane's "Annual Incentive Compensation" bonus for Rave's FY2017 "shall be" $200,000. *See* Schwarz Decl. at Ex 5, p. 2. In August 2017, after the end of FY2017 (July 2016 to June 2017), the Rave Board Compensation Committee authorized, and Rave paid Crane, that $200,000 bonus. *See id.* at ¶ 8 & Ex. 7.

The Compensation Committee minutes for its August 28, 2017, meeting noted that Rave "had not paid bonuses to senior management in recent years due to failure to meet targets," but the Committee authorized $65,000 in "exception-based bonus" awards for senior managers other than Crane. *Id.* at Ex. 7, pp. 1-2.

## D.    December 2017: Rave Grants Crane an RSUA Agreement During Its FY2018 Tied to Rave's Financial Performance During Its FY2020.

As noted above, apart from the initial grant of RSUs under the 2015 LTIP upon his start date, the January 6, 2017, Employment Agreement stated that Crane would be "eligible for additional LTIP awards following each full fiscal year that [he was] employed by the Company, subject to approval of the Compensation Committee." *See* Schwarz Decl. at Ex. 5, pp. 2-3.

On December 29, 2017—i.e., during Rave's FY2018—Rave granted Crane a second "Restricted Stock Unit Award Agreement." *Id.* at ¶ 11 & Ex. 9. This RSUA Agreement explained

that it granted Crane 266,667 units with a "Vesting Date" of "October 15, 2020" and noted certain new "Performance Criteria." *Id.* at Ex. 9, p. 1.

Other than those terms, this RSUA Agreement (granted during Rave's FY2018) had the same Terms and Conditions as the RSUA Agreement granted during FY2017. *See id.*, pp. 2-6. As one would expect, the attached Exhibit A to the RSUA Agreement granted during FY2018 explained that the financial performance targets tied to vesting would be measured against Rave's FY2020—i.e., July 2019 through June 2020—financial performance. *Id.*, p. 6.

**E.      September 2018: Rave's Annual Bonus Payments to Crane for FY2018.**

The January 6, 2017, Employment Agreement "Annual Incentive Compensation" section said Crane would be "eligible to participate in the Company's executive bonus plan. . . ." *See* Schwarz Decl. at Ex. 5, p. 2. Apart from provisions giving Rave discretion in any such bonus award and imposing certain conditions for receipt (including remaining employed through payment), the Agreement stated that annual bonus targets were generally set for "100% of [Crane's] base annual salary [and were] typically not paid until the Company's financial audit" for the fiscal year of the bonus. *Id.*

For FY2018, Rave adopted a quarterly bonus award consideration for certain executive level employees, and, by September of 2018 (i.e., by the end of FY2018), the Rave Board Compensation Committee had authorized, and Rave had paid, bonus payments to Crane for FY2018 totaling $399,816 (i.e., 99.95% of target). *See id.* at ¶ 12 & Exs. 10-11.

**F.      Rave Did Not Grant Any RSUA Agreements During Its FY2019.**

The January 6, 2017, Employment Agreement stated that Crane would be "eligible for additional LTIP awards following each full fiscal year that [he was] employed by the Company, subject to approval of the Compensation Committee." *See* Schwarz Decl. at Ex. 5, pp. 2-3. However, the Rave Compensation Committee did not approve the granting of RSUA Agreements for anyone at Rave during its FY2019 (July 2018 through June 2019), which, according to prior practice, would have

tied vesting to Rave's financial performance to Rave's FY 2021. *See id.* at ¶ 13. In early calendar 2019, after being hampered by management's failure to produce three-year financial performance goals, the Compensation Committee proposed performance criteria for RSUA Agreements to be granted during FY2019 (tied to FY2021 performance), but Crane wanted to "negotiate" the targets, and RSUA Agreements were then not taken up. *See id.* at ¶ 13 & Exs. 12-13.

**G.      July 2019: Crane's Employment with Rave is Terminated.**

On July 10, 2019, after proposing in May to become a part-time CEO at reduced pay (and other items), Crane was discharged from his employment. Rave did not invoke the termination for cause provisions of the January 6, 2017, Employment Agreement. *See* Schwarz Decl. at ¶ 14.

**H.      Crane Refuses to Sign Rave's Form of Release Required for Severance Pay.**

During the meeting in which Crane's employment was terminated, he was presented with a Separation Agreement and Release of Claims that, as required by the January 6, 2017, Employment Agreement, provided for the severance payment applicable to a not-for-cause termination ($300,000) in exchange for a release of claims. *See* Schwarz Decl. at ¶ 15 & Ex. 14. The January 6, 2017, Employment Agreement required execution of a release of claims "on a form acceptable to" Rave, *see id* at Ex. 5, pp. 3-4, but Crane did not sign Rave's proposed release. He instead returned a copy with additional provisions unacceptable to Rave. *See id.* at ¶ 16 & Ex 15.

## III.      ARGUMENT AND AUTHORITY

**A.      Standard of Review.**

Summary judgment is proper if there is "no genuine issue as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant must state the basis for the motion and identify material that shows the absence of a fact issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a non-movant has the burden of proof, a "moving party may make a proper summary judgment motion, thereby shifting the summary judgment burden to

the nonmovant, with an allegation that the nonmovant has failed to establish an element essential to that party's case." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). The nonmovant must then set out "specific facts" showing a "genuine issue for trial." Fed. R. Civ. P. 56(e).

**B.      Crane's Contractual Claims For Rave Stock Fail as a Matter of Law.**

Crane first asserts a breach of contract claim arising from his alleged entitlement to Rave stock not delivered on or about October 15, 2019. *See* Compl. ¶ 44. He makes similar claims for declaratory relief relating to his alleged entitlement to shares of Rave stock in October of 2020 and 2021. *Id.* at ¶¶ 28-29 & 64-66. Those claims are based, respectively, on (a) the RSUA Agreement granted during Rave's FY2017 that tied vesting to Rave's FY2019 performance (*see* Schwarz Decl. at Ex. 6 (Section II.B above)), (b) the RSUA Agreement granted during Rave's FY2018 that tied vesting to Rave's FY2020 performance (*see id.* at Ex. 9 (Section II.D above)), and (c) a non-existent RSUA Agreement that tied any vesting to Rave's FY2021 financial performance (*see id.* at ¶ 13 (explaining same) (Section II.F above)). Those claims fail as a matter of law.

**1.      Crane's Termination Before Any Vesting Date Precludes Any Recovery.**

As explained above, the Terms and Conditions of the RSUA Agreements Crane received (a) granted a stated number of "Units"; (b) explained that vesting of any units required, among several other things, that Crane "remain continuously employed through the Vesting Date" (i.e., October 15, 2019, and October 15, 2020); (c) expressly provided that "[a]ll unvested Units will be forfeited in the event [Crane] cease[d] to be an employee of [Rave] before the Vesting date ***for any reason***" with exceptions for various inapplicable reasons; and (d) confirmed that the RSUA Agreement did not "confer upon [Crane] any right to remain in the employ of" Rave. *See*, *e.g.*, Schwarz Decl. at Ex. 6, pp. 2-3 (emphasis added); *see supra* at §§ II.B & II.D (explaining same).

The 2015 LTIP—which governed the RSUA Agreements—also required "forfeit[ure of] all unvested" units upon discharge in the same way. *See* Schwarz Decl. at Ex. 4, p. 12.

Crane was discharged in July of 2019. *See* Schwarz Decl. at ¶ 14. Under his January 6, 2017, Employment Agreement, Crane could have collected a $300,000 severance payment upon signing a release on a form acceptable to Rave. *See id.* at Ex. 5, pp. 3-4. But the plain language of the RSUA Agreements (and 2015 LTIP) expressly provided that any Units that Crane received under the two RSUA Agreement he had (which remained unvested, because the *earliest* vesting date was October 15, 2019) were forfeited. Rave did not grant Crane an RSUA Agreement in Rave's FY2019 for vesting in October of 2021, *see id.* at ¶ 13, but any such agreement would have been subject to the same forfeiture requirement upon Crane's July 2019 termination.

### a.     Under Texas Law, Any Unvested Right to Rave Stock Was Forfeited.

Under Texas law, "[t]he essential elements of a breach of contract claim are the existence of a valid contract, performance or tender of performance by the plaintiff, breach of the contract by the defendant, and damages sustained as a result of the breach." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 731 (5th Cir. 2018). Crane cannot show that Rave has or will *breach* any contractual obligation to deliver Crane shares of Rave stock (which only flow from the RSUA Agreements he received) because Crane's alleged entitlement to Rave stock was unvested and was forfeited upon his July 2019 termination.

A court's "primary concern" when it construes a contract "is to ascertain the parties' true intent as expressed in the contract." *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). The intention of the parties as set out in the RSUA Agreements Crane received is plain: Crane would "forfeit" all unvested Rave restricted stock units if he "cease[d] to be an employee" of Rave "for any reason" (with exceptions not applicable here) before the vesting date of any restricted stock unit award. Crane's termination effected the forfeiture of all of the units he had received, because they were all unvested when he was discharged. This Court should enforce that plain intention. Other courts have done so, regularly enforcing similar terms of analogous agreements.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– Page 12**

For example, the Fifth Circuit enforced an express requirement that a worker be employed on a certain date to receive a bonus in *Wilson v. Noble Drilling Servs., Inc.*, 405 Fed. Appx. 909, 915 (5th Cir. 2010). Distinguishing a Texas state case that had awarded a pro rata share of a bonus to an employee who had been discharged just before the bonus distribution date where a continued employment requirement was "not agreed upon by the parties or committed to writing," *id.*, the *Wilson* court held that, because the written agreement there "expressly state[d] that [the plaintiff was] entitled to the STIP bonus only if he [was] employed on the date that the STIP bonus [was] distributed," the agreement had to be enforced and the plaintiff's claim failed. *Id.*

Even more on point, courts have enforced terms in bonus and stock option plans that—just like the RSUA Agreements and LTIP Plan here—required forfeiture of the benefit if the employee ceased to be an employee "for any reason" before a specified date.

For example, in *Authier v. Automated Logic Consult. Servs.*, No. 5:14-cv-993, 2016 U.S. Dist. LEXIS 98513 (W.D. Tex. July 28, 2016), the court addressed language in a bonus plan which stated that an employee whose "employment is terminated for any reason . . . prior to receiving an incentive award" would "forfeit . . . any right to receive the incentive award." Judge Ezra held that that language was "unambiguous," "clearly shows the parties' intent as contractually expressed," and required that the plaintiff's "breach of contract claim fails as a matter of law because the contract expressly states he is owed no incentive due to his termination." *Id.* at *19-21.

Similarly, in *Skelton v. Mobile Sys. Int'l, Inc.*, No. 3:98-cv-1254, 2000 U.S. Dist. LEXIS 4725 (N.D. Tex. Apr. 14, 2000), the court rejected a claim that Texas law prevented an employer "from forfeiting [a stock] option" where a "call provision of the ESOP applie[d] 'in the event that an employee's employment with [the employer] [was] terminated for any reason whatsoever,'" and meant the employer could repurchase any exercised option and leave the plaintiff without a benefit. The provision "le[ft] no doubt as to [the employer's] intentions." *Id.* at *22 & * 24.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– Page 13**

The analysis here is the same. Crane cannot show that Rave has or will breach an obligation to deliver Rave stock, because Crane's unvested right to stock has been forfeited.

### b. Parties Agreed to What Would Happen Upon Termination.

The preceding discussion shows that Crane's contract-based claims for Rave stock should be dismissed. But as has been noted and will be discussed, the parties expressly agreed to what would be available if Crane was discharged without cause before any vesting: severance pay alone. The fact that Rave and Crane addressed that matter further shows that there is no reason to ignore the plain requirement for forfeiture of unvested restricted stock units upon Crane's termination.

### c. Crane's Cannot Escape the RSUA Agreements' Forfeiture Provision.

Crane's Complaint argues he is entitled to Rave stock because (a) by discharging him in July of 2019, Rave prevented him from remaining continuously employed through any vesting date and (b) he should be excused from having to fulfill that condition. He cites the unpublished case *Sellers v. Minerals Techs., Inc.*, 753 Fed. Appx. 272 (5th Cir. 2018), in support of that argument. His argument, however, fails, because the facts of that case are dispositively different.

Crane's contention focuses on the paragraph 2 "Vesting" provision of the RSUA Agreements' Terms and Conditions, which states that the awarded restricted stock units would "become fully vested and nonforfeitable if" Crane "remain[ed] continuously employed" by Rave through the "Vesting Date" and other conditions were met. *See, e.g.*, Schwarz Decl. at Ex. 6, p. 2.

However, paragraph 2 cannot be read in isolation from and without the corresponding paragraph 5 "Forfeiture of Units" provision (and parallel term in the 2015 LTIP), which required "forfeit[ure]" of "unvested" units if Crane "cease[d] to be an employee" of Rave "for any reason," with exceptions inapplicable here. Paragraph 5 reinforces what is plain in paragraph 2: If Crane did not remain employed through the vesting date, there is no vesting. Given the plain terms of the separate forfeiture provision, this Court should enforce it, just as other courts have.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– Page 14**

*Sellers* is no different. There, a plaintiff claimed he was owed a long-term incentive payment after he was discharged without cause before the January 18, 2015, date on which he had to be employed in order to be entitled to the payment. *Sellers*, 753 Fed. Appx. at 273-76. The Circuit first said that being employed on January 18 was a condition precedent to entitlement to the payment, but that the condition *had* been met because the plaintiff was still "technically" employed then. *Id.* at 278. The court then discussed (in dicta) the analysis *if* the plaintiff's employment had ended before January 18. One section of the incentive plan (3(c)) said that he would "not be eligible" for the payment if he resigned or was terminated *for* cause. Another section (11(d)) addressed termination *without* cause, but it did <u>*not*</u> set out a similar non-eligibility/forfeiture provision. The court thus said that, *if* the plaintiff's termination without cause occurred before January 18, that could have excused him from having to meet the being-employed condition of payment. But the key aspect of *Sellers*—unlike the case here—is that the clear forfeiture provision for termination *with* cause did <u>*not*</u> apply to a discharge *without* cause.

Here, <u>unlike</u> *Sellers*, an express forfeiture agreement applies, and the parties expressly agreed to what would happen on a termination without cause. The RSUA Agreements provide— and 2015 LTIP requires—that Crane would "forfeit[]" any unvested units if he "cease[d] to be an employee" "for any reason" before the vesting date. The existence of that express agreement shows that this case falls squarely under the *Wilson*, *Authier*, and *Skelton* line of cases, and not *Sellers*. *See also Doherty v. Am. Home Prod. Corp.*, No. 99-9533, 2000 U.S. App. LEXIS 14166, *4-5 (2d Cir. June 15, 2000) (noting that "the prevention doctrine does not apply where, under the contract, one party assumes the risk that fulfillment of the condition precedent will be prevented" and holding that at-will employees assumed the risk that "their right to exercise their [stock] options would be shortened or eliminated by their termination" where, "under the plain language of the Option Plans, [the employees] were entitled to exercise their options only while employed").

2.      **Crane Cannot Prevail on a Claim for Rave Stock Tied to FY2021 Financial Results Because He Did Not Receive an RSUA Agreement Tied to That Year.**

Crane's Complaint appears to assert a claim for Rave stock tied to Rave's FY2021 financial results. But as explained above, Rave did not grant Crane (or anyone else) an RSUA Agreement tied to FY2021 performance. *See* Schwarz Decl. at ¶ 13 & Exs. 12-13; *supra* § II.F. Thus, apart from his termination _years_ before any vesting date, Crane has no basis to complain that he is entitled to Rave stock under an RSUA Agreement tied to FY2021 performance.

Nor was there any contractual obligation to grant Crane an RSUA Agreement tied to FY2021 performance. Under Crane's January 6, 2017, Employment Agreement, after the granting of the first RSUA Agreement (tied to FY2019 performance), Crane was just "eligible for additional" RSUA Agreements in future years, but any such award was "subject to approval of the Compensation Committee." *See* Schwarz Decl. at Ex. 5, pp. 2-3. As explained in the immediately following section, Crane being "eligible" for subsequent RSUA Agreements "subject to approval of the Compensation Committee" did not impose on Rave a contractual obligation to grant him any units.

C.      **The Contract Claim for Failure to Pay Bonuses Similarly Fails as a Matter of Law.**

Crane also asserts a claim for a bonus for the Rave fiscal year 2019, which ended June 2019. *See* Compl. ¶ 37. It is not clear whether he asserts a claim for a bonus for FY2020. The "Annual Incentive Compensation" paragraph of the January 6, 2017, Employment Agreement states:

> In addition to your Base Annual Salary, you shall be eligible to participate in the Company's executive bonus plan . . . . The amount of bonus earned each year is subject to the approval of the Board of Directors, which may use its discretion to interpret the Company's achievement of the bonus targets . . . . Bonuses are typically not paid until the Company's financial audit is complete, and executives must remain employed by the Company until the bonus payment date to receive a bonus . . . .

*See* Schwarz Decl. at Ex. 5, p. 2. This language precludes any claims for bonus payments.

_**First**_, the language of the bonus provision did not give Crane any contractual right to a bonus. He was only "eligible" to receive a bonus, the amount of any bonus was "subject to the

approval" of Rave's board, and the board had "discretion" in the award of any bonus. *Id.* Courts recognize that such language creates no contractual right to a bonus payment.

For example, in *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185 (5th Cir. 2007), the Circuit (applying Texas law) held that, where a contract "include[s] the very terms giving [an employer] discretion to adjust" amounts to be paid to an employee, *id.* at 189, there is no basis for a breach of contract claim. Similarly, in *Oldham v. ORIX Fin. Servs.*, No. 3:05-cv-2361, 2007 U.S. Dist. LEXIS 11855 (N.D. Tex. Feb. 21, 2007), the court explained that "certain disclamatory provisions render [incentive pay] schemes merely aspirational incentives, not enforceable contracts which codify obligations." *Id.* at *6-7. The "disclamatory provisions" cited in *Oldham* included language that an incentive pay committee was "solely responsible for, and has final decision authority regarding all aspects of the Plan, including . . . interpreting the plan . . . and adjusting individual payouts." Crane's January 6, 2017, Employment Agreement similarly provides that Crane was only "eligible" to receive a bonus, "subject to the approval" of Rave's board, which had "discretion" in the award. That language has the same legal effect.

Texas courts have reached the same conclusion. In *Pride Int'l, Inc. v. Bragg*, 259 S.W.3d 839 (Tex. App.—Houston [1st Dist.] 2008, no pet.), a Texas court held that a plaintiff's contract with his employer which stated that the plaintiff "shall be eligible to participate on a reasonable basis . . . in incentive compensation plans" did not create a contractual obligation to pay a bonus, because the contract "merely provides that [the plaintiff was] eligible to receive bonuses, but [did] not require that they be paid." *Id.* at 848. Likewise, in *Lewis v. Vitol, S.A.*, No. 01-05-00367-CV, 2006 Tex. App. LEXIS 5645 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (mem. op.), the court found that a plaintiff had no breach of contract claim against his employer for a bonus where the relevant agreement said the plaintiff was only "eligible" for a bonus, "indicating that [the plaintiff was] not guaranteed a bonus, but [was] qualified, or eligible, to be considered for a bonus." *Id.* at

*12. Any "bonus was purely discretionary[, and the plaintiff] was not contractually entitled to it." *Id.* at *13. Crane was also only "eligible" to receive a bonus. The *Pride Int'l* and *Lewis* court analyses and results apply here. Crane's claim for a bonus should be dismissed.

**_Second_**, Crane did not otherwise qualify for the bonus he seeks. Any Rave annual bonus is "typically not paid until the Company's financial audit is complete" and one "must remain employed" to receive it. *See* Schwarz Decl. at Ex. 5, p. 2. Crane was discharged in July of 2019, Rave's audit for FY2019 was not completed until September of 2019, and bonuses for that fiscal year were not paid until October of 2019, well after the date Crane was no longer employed. *Id.* at ¶¶ 14 & 17. Crane thus has no contractual right to a bonus for that year. The same analysis applies to any claim for a FY2020 bonus. *See Wilson*, 405 Fed. Appx. at 915 (where agreement "expressly state[d] that [the plaintiff was] entitled to the STIP bonus only if he [was] employed on the date that the STIP bonus [was] distributed," the agreement had to be enforced and plaintiff's claim failed); *O'Grady v. Gerald D. Hines, Inc.*, 683 S.W.2d 763, 765 (Tex. App.—Houston [14th Dist.] 1984, no writ) (enforcing agreement that no commissions would be paid after termination).

These same deficiencies apply to any other claim by Crane for an annual bonus payment.

## D.     Summary Judgment is Proper on Crane's Contract Claim for Unpaid Vacation.

Crane further claims he is entitled to "unpaid vacation." *See* Compl. ¶ 37. The "Employee Benefits" paragraph of the January 6, 2017, Employment Agreement states:

> During the Initial Term and any Extended Term while you are employed by the Company, you will be entitled to receive the same benefits as the Company makes generally available from time to time to the Company's senior executives, as those benefits may be modified, reduced or eliminated from time to time. Vacation . . . will be available to you as set forth in the Company's standard benefit package and *Employee Handbook*. Such rights, programs and benefit plans may be revised from time to time at the Company's sole discretion.

*See* Schwarz Decl. at Ex. 5, p. 5. The Rave Employee Handbook similarly reserved the "right to revise, modify, delete or add to any . . . benefits" including vacation pay. *Id*. at Ex. 20, p. 2.

This text creates no contractual right to "unpaid vacation." Rave's ability to "modif[y], reduce[] or eliminate[]" benefits or "revise[]" them at its "sole discretion" shows there is no enforceable contractual obligation to paid vacation. *Oldham*, 2007 U.S. Dist. LEXIS 11855 at *6-7 (there is no contractual obligation where a writing made all terms modifiable at the discretion of the employer); *Ryan v. Superior Oil Co*., 813 S.W.2d 594, 596 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (breach of contract claim for value of vacation time failed as a matter of law because vacation plan stated it "may be terminated or modified at any time").

## E.      Crane Claim for Severance Pay or COBRA Premiums Fails as a Matter of Law.

Crane's claim to $300,000 in severance pay and COBRA premium payments is also governed by the "Termination of Employment" paragraph of Crane's Employment Agreement:

> Prior to the expiration of the Initial Term or any Extended Term, the Company may terminate your employment at any time for Cause or without Cause. . . .
>
> If (i) the Company terminates your employment Without Cause . . . and (ii) <u>you have executed a full, complete, and binding release of the Company from any and all liabilities arising in connection with your employment by the Company or the termination thereof, on a form acceptable to the Company</u>, then you will be entitled to severance compensation and benefits as follows:
>
> (1) Termination By Rave Restaurant Group Without Cause or Resignation By You For Good Reason, in Each Case Without a Change In Control: In such an instance, you will receive:
>
> • The continued payment of your Base Annual Salary for the duration of the Severance Period . . . [which Crane claims equals $300,000].
>
> • For the duration of the Severance Period, group health insurance coverage at least equal to that which would have been provided to you if your employment had not been terminated or, at the Company's election, payments for the applicable COBRA premium for such coverage . . . .

*See* Schwarz Decl. at Ex. 5, pp. 3-4 (emphasis added). This language shows that Crane was only entitled to $300,000 in severance pay and COBRA premium payments after termination without cause if he executed release "on a form acceptable to the Company." Rave presented such a release, but Crane refused to sign it. *See id.* at ¶¶ 15-16 & Exs. 14-15; *supra* § II.H. Having refused to sign, Crane has no grounds on which to claim he is contractually entitled to the $300,000 in severance pay and the COBRA premium payments he seeks.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– Page 19**

**F.      Summary Judgment is Proper on Crane's Fraudulent Inducement Claim.**

Crane's claim that Rave fraudulently induced him to become CEO by falsely promising to award Rave shares if certain performance benchmarks were met also fails. *See* Compl. ¶¶ 47-54.

Fraudulent inducement is a "species of common-law fraud" that "arises only in the context of a contract." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). Such a claim requires proof of "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury." *Id.* In a fraudulent-inducement claim, the "misrepresentation" occurs when the defendant promises to perform a future act while having no present intent to perform it. *Id*. The plaintiff's "reliance" on such a false promise "induces" the plaintiff to agree to a contract the plaintiff would not have agreed to if the defendant had not made the false promise. *See id*. Crane cannot establish the elements of such a claim.

**1.      Crane Disclaimed Reliance on Matters Before the Employment Agreement.**

First, Crane—a self-styled "highly regarded and experienced CEO," Compl. ¶ 1—cannot base a fraud claim on any representation preceding the January 6, 2017, Employment Agreement, because he disclaimed reliance. The Agreement, which the parties negotiated, has an "Acceptance" section in which Crane agreed that "[a]ny representations that may have been made to [him] concerning the terms and conditions of employment, whether orally or in writing, are cancelled and superseded by this letter." *See* Schwarz Decl. at Ex. 5, p. 8. That is sufficient to bar a fraud claim based on any representation apart from promises in the Employment Agreement or RSUA Agreements, because Crane cannot show reliance. *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 868-70 (Tex. App.—Austin 2006, pet. dism'd by agr.) ("By contractually 'cancelling' all pre-FLA 'agreements, negotiations, commitments and understandings' and 'superseding' them with

the FLA," parties' contract "amounted to a disclaimer of the existence of pre-contract agreements, promises or representations and any right of the parties to rely upon them.").

### 2.    Crane Cannot Establish the Reliance Element of a Fraud Claim.

Further, as to *any* representations (i.e., either preceding the January 6, 2017, Employment Agreement or in that Agreement or any RSUA Agreement), Crane cannot establish reliance, because any reliance on a representation that Crane would receive Rave stock was unreasonable.

Before he agreed to become CEO, Crane received the 2015 LTIP and a form RSUA Agreement. *See* Schwarz Decl. at Exs. 1-4; *supra* § II.A. Those documents plainly set out the provision requiring, for example, forfeiture of unvested units if he were to be terminated (with exceptions that do not apply here) and explaining that there was no right to continued employment. *See id*. at Ex. 3, pp. 3-4 & Ex. 4, p. 11. These facts preclude a finding of reliance for two reasons.

First, a party is not justified in relying on alleged representations that precede execution of a written contract that directly contradict the representations. *Mercedes-Benz USA, LLC v. Carduco, Inc*., 583 S.W.3d 553, 554-55 (Tex. 2019) (representation that car dealership would be allowed to expand to neighboring area could not form basis of fraudulent inducement claim because dealership agreement contradicted representation, so justifiable reliance was negated as matter of law). Just as in *Mercedes-Benz*, Crane cannot have reasonably relied on a representation he would receive Rave stock, because the 2015 LTIP and RSUA Agreements through which he could have received such stock said unvested units would be forfeited upon termination.

Second, and relatedly, Texas law recognizes that an employee who may be discharged without cause cannot reasonably rely on a representation that depends on continued employment, because the employee knows that his employment may be terminated. *Sawyer v. E. I. du Pont de Nemours & Co*., 430 S.W.3d 396, 401 (Tex. 2014). Here, the January 6, 2017, Employment Agreement expressly allowed Rave to discharge Crane without cause (and pay $300,000 in

severance if Crane were to sign a Release acceptable to Rave). *See supra.* Because any entitlement to Rave stock through an RSUA Agreement required continued employment through a vesting date (the earliest of which was October 15, 2019), Crane, as a matter of law, cannot have reasonably relied on any alleged representation that he would receive Rave stock through an RSUA Agreement. Indeed, the *Sawyer* court separately recognized that, where an employee has contractual remedies upon being discharged, "allow[ing] a fraud action [to seek other remedies] would defeat the parties' bargain." *Id.* at 404-405. That principle applies here. As explained in § III.B.1.b above, reading the January 6, 2017, Employment Agreement and the provisions of the 2015 LTIP and form (and later final) RSUA Agreement together, the parties bargained for what would happen if Crane was discharged before any RSUA vesting: he would be entitled to severance (upon execution of a release), but there are no grounds assert a claim for other benefits.

### 3. Crane Cannot Show That Rave Had No Intention of Performing Under the Employment Agreement.

To establish fraudulent inducement, a plaintiff must also show he entered into a contract and the defendant had no intention of performing when the contract was entered into. *Anderson*, 550 S.W.3d at 614. Crane cannot make that showing.

Texas courts recognize that partial performance, as a matter of law, negates a showing of an intent not to keep a promise when it was made. *Hardwick v. Smith Energy Co.*, 500 S.W.3d 474, 480-81 (Tex. App.—Amarillo 2016, pet. dism'd by agr.). Here, Rave performed under the January 6, 2017 Employment Agreement by paying Crane's salary, a $200,000 FY2017 bonus, a $399,816 FY2018 bonus, granting Crane RSUA Agreements, and tendering the release required for Crane to collect $300,000 in severance. Crane cannot show Rave had no intention of performing at the outset.

4.      **Crane Cannot Show Causation of an Injury.**

Crane also cannot establish the causation element of a fraud claim. As noted, the conditions for unit vesting did not occur, as Crane did not remain employed through any vesting date.

If Crane attempts to assert fraud claims as to other matters, they fail for the same reasons.

G.      **The Statutory Fraud Claim Should Also Be Dismissed.**

Finally, Crane's statutory fraud claim under Texas Business and Commerce Code § 27.01, *see* Compl. ¶¶ 55-62, fails for the same reasons as set out above, and because the statute does not apply to a transaction that—like the RSUA Agreements—"only grants unvested stock." *Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 823-24 (Tex. App.—Houston [1st Dist.] 2015, no pet.). In fact, Crane conceded this claim in prior briefing. *See* Pl. Resp. Mot. Dis., p. 15 [ECF 14].

## IV.      CONCLUSION

For the reasons stated above, the Court should enter judgment dismissing Crane's claims with prejudice and grant Rave such other and further relief to which it is entitled.

Respectfully submitted,


_____/s/ Scott M. McElhaney_____
W. Gary Fowler
Texas State Bar No. 07329250
Scott M. McElhaney
Texas State Bar No. 00784555
**JACKSON WALKER L.L.P.**
2323 Ross Avenue, Ste. 600
Dallas, Texas 75201
(214) 953-6000 (office)
(214) 953-5822 (facsimile)
gfowler@jw.com
smcelhaney@jw.com

**ATTORNEYS FOR DEFENDANT
RAVE RESTAURANT GROUP, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of November, 2020, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court for the Eastern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following counsel of record who have consented in writing to accept that Notice as service of this document by electronic means:

R. Rogge Dunn
Joshua J. Iacuone
Brian P. Shaw
Rogge Dunn Group PC
500 N. Akard Street., Ste. 1900
Dallas, Texas 75201

_____/s/ Scott M. McElhaney_____