# TAB A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SCOTT CRANE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-00013 |
| | § | |
| RAVE RESTAURANT GROUP, INC., | § | |
| | § | |
| Defendant. | § | |

**DECLARATION OF MARK E. SCHWARZ**

I, Mark E. Schwarz, declare:

1. My name is Mark E. Schwarz. I am over 21 years of age, and I am of sound mind and fully competent to make this Declaration. I am currently and have been since 2004, the Chairman of the Board of Directors of Rave Restaurant Group, Inc. During the time periods relating to this lawsuit, I have also served as Chair of the Rave Restaurant Group, Inc. Board of Directors Compensation Committee. All of the facts contained in this Declaration are within my personal knowledge, unless otherwise stated, and are true and correct.

2. Rave is a publicly traded corporation that is the home of two restaurant concepts: Pie Five Pizza, a leading fast casual pizza company, and Pizza Inn, one of the country's first dine-in pizza chains.

3. During November and December of 2016, Scott Crane held various discussions about becoming Chief Executive Officer of Rave and the terms and conditions of Crane's potential employment in that role with me and another Rave representative.

4. In that process, on December 7, 2016, I sent Crane an email attaching certain documents relating to a proposed compensation package for Crane. Attached to this Declaration as Exhibit 1 is a true and correct copy of the email I sent to Crane at that time. The attachments to that email included an initial draft of an offer letter as well as (a) a blank form of an Restricted Stock Unit Award ("RSUA") Agreement and (b) a copy of the Pizza Inn Holdings, Inc. 2015 Long Term Incentive Plan under which RSUA Agreements were granted. (Rave was formerly known as Pizza Inn Holdings, Inc.) Attached to this Declaration as Exhibit 2 is a true and correct copy of an "Overview of Restricted Stock Units" document that was one of the attachments to the December 7, 2016, email. Attached to this Declaration as Exhibit 3 is a true and correct copy of the blank form of an RSUA Agreement sent with the email. Attached to this Declaration as Exhibit 4 is a true and correct copy of the Pizza Inn Holdings, Inc. 2015 Long Term Incentive Plan sent with the email.

5. After negotiating various changes to the initial draft employment agreement, Crane accepted the offer to become Rave's CEO. Crane signed the employment agreement with Rave on January 6, 2017. Rave announced Crane's appointment on January 9, 2017. A true and correct copy of the fully executed January 6, 2017, Employment Agreement is attached to this Declaration as Exhibit 5.

6. Pursuant to the January 6, 2017, Employment Agreement's provision for a grant of 300,000 Restricted Stock Units on his start date, Crane and Rave executed a "Restricted Stock Unit Award Agreement" dated January 12, 2017. A true and correct copy of that Restricted Stock Unit Award Agreement is attached to this Declaration as Exhibit 6.

7. Rave's fiscal year generally runs from July of one year through June of the following year. Thus, for example, Rave's fiscal year 2017 ("FY2017") ran from July of 2016 through June of 2017. The RSUA Agreement Crane received on January 12, 2017, immediately after he stared as CEO was thus granted during the third quarter of Rave's FY2017.

8. In August 2017, after the end of FY2017 (July 2016 to June 2017), the Rave Board Compensation Committee authorized, and Rave paid Crane, the $200,000 bonus called for in his Employment Agreement. Attached to this Declaration as Exhibit 7 is a true and correct copy of the Minutes of the Compensation Committee of the Board of Directors of Rave Restaurant Group, Inc. for its meeting on August 28, 2017.

9. On December 27, 2017, pursuant to its authority, the Compensation Committee amended and relaxed the financial performance criteria of the RSUA Agreements that were tied to Rave's FY2019 results. Attached to this Declaration as Exhibit 8 is a true and correct copy of the Action by Consent of the Compensation Committee of the Board of Directors of Rave Restaurant Group, Inc. dated December 27, 2017. Through the Action, the Compensation Committee lowered the performance targets for three of the six categories and eliminated two.

10. For those who received RSUA Agreements during FY2017 (tied to FY2019 performance) and who had units for categories that were eliminated, the units for the eliminated categories were reallocated pro rata to the remaining categories for which the individual had first been granted units. Thus, because Crane had been granted Units measured by the later-eliminated Pre-Tax Adjusted EPS and Pie Five Store Excess ROIC categories, the units corresponding to those categories were considered to be reallocated to the remaining two categories for which Crane had been granted units—(a) Adjusted EBITDA and (b) Total Franchise Royalties.

11. On December 29, 2017—i.e., during Rave's FY2018—Rave granted Crane a second RSUA Agreement. A true and correct copy of that Restricted Stock Unit Award Agreement is attached to this Declaration as Exhibit 9.

12. For FY2018, Rave adopted a quarterly bonus award consideration for certain executive level employees, and, by September of 2018 (i.e., by the end of FY2018), the Rave Board Compensation Committee had authorized, and Rave had paid, bonus payments for Crane totaling $399,816 (i.e., 99.95% of target). Attached to this Declaration as Exhibit 10 is a true and correct copy of a September 20, 2018, email exchange that I had with Andrea Allen, who at the time was Rave's Chief Accounting and Administrative Officer, confirming the bonus amounts.

Attached to this Declaration as Exhibit 11 is a true and correct copy of the Minutes of the Compensation Committee of the Board of Directors of Rave Restaurant Group, Inc. for its meeting on September 18, 2018.

13.  The Rave Board Compensation Committee did not approve the granting of RSUA Agreements for anyone at Rave during its FY2019 (July 2018 through June 2019), which, according to prior practice, would have tied vesting to Rave's financial performance to Rave's FY2021 and had a vesting date of October 15, 2021. With respect to RSUA Agreements to be granted in FY2019 (and tied to FY2021 performance), the Committee's work was hampered by management's failure to produce three-year target performance goals. Nonetheless, in early calendar year 2019, the Rave Compensation Committee proposed performance criteria for RSUA Agreements to be granted during FY2019 (tied to FY2021 performance), but Crane wanted to "negotiate" the proposed targets, and RSUA Agreements were then not taken up again during the fiscal year. Attached to this Declaration as Exhibit 12 is a true and correct copy of a February 19, 2019, email from me to other members of the Compensation Committee discussing performance criteria for RSUA Agreements to be granted during FY2019. Attached to this Declaration as Exhibit 13 is a true and correct copy of a February 25, 2019, email from me to other members of the Compensation Committee again discussing RSUA Agreements.

14.  On July 10, 2019, following his May 2019 proposal to become a part-time CEO at reduced pay (and other items), Rave discharged Crane from his employment. Rave did not invoke the termination for cause provisions of the January 6, 2017, Employment Agreement in connection with his firing.

15.  During the meeting in which Crane's employment was terminated, I presented Crane with a Separation Agreement and Release of Claims that, as required by the January 6, 2017, Employment Agreement, provided for the severance payment applicable to a not-for-cause termination ($300,000) in exchange for a release of claims. Attached to this Declaration as Exhibit 14 is a true and correct copy of the Separation Agreement and Release of Claims presented to Crane at that time.

16.  Crane did not sign Rave's proposed release. He instead returned a copy with additional provisions unacceptable to Rave added to the Separation Agreement that Rave had tendered. Attached to this Declaration as Exhibit 15 is a true and correct copy of the Separation Agreement and Release of Claims that Crane returned to Rave.

17.  On September 30, 2019, Rave issued its SEC Form 10-K containing its certified audited financial results for FY2019. On October 17, 2019, after the filing of the company's SEC Form 10-K, the Rave Board Compensation Committee reviewed Rave's final audited fiscal-year results for FY2019 to measure the company's financial performance (a) against the amended performance criteria for the RSUA Agreements granted in FY2017 and tied to FY2019 performance, in order to determine vesting of the RSUA Agreements for the remaining Rave employees who had been granted RSUA Agreements for that year, and (b) against the FY2019 bonus award payment performance targets. Attached to this Declaration as Exhibit 16 is a true and correct copy of the Minutes of the Compensation Committee of the Board of Directors of Rave Restaurant Group, Inc. for its meeting on October 17, 2019. Attached to this Declaration as Exhibit 17 is a true and correct copy of the Exhibits to the Minutes of the Compensation Committee of the

**DECLARATION OF MARK E. SCHWARZ – Page 3**

Board of Directors of Rave Restaurant Group, Inc. for its meeting on October 17, 2019. The Compensation Committee did not grant any exceptions from the requirement that one remain continuously employed through the vesting date of the RSUA Agreements granted in FY2017 and tied to FY2019 performance.

18. In its evaluation of the Adjusted EBITDA metric that applied to other RSUA Agreements, the Committee made a few adjustments, but one was significant enough to show that the minimum performance level for vesting was not met. As reflected in the Minutes and Exhibits, that adjustment was for $783,000 in non-cash revenue recognized in FY2019 due to Rave's adoption (which it was required to adopt in order to comply with GAAP accounting as set out by the Financial Accounting Standards Board (FASB)) of a new accounting standard—ASC 606.

19. The Committee also made an adjustment to the Adjusted EBITDA metric to account for an unusual, unforeseen, and unbudgeted "recapture" of royalty income that arose because of the termination of an area developer agreement, which resulted in underlying franchise stores paying Rave additional royalty income that was no longer paid to the area developer. The increase in revenue occurred because the contract between Rave and the area developer (Clairday) was terminated, but litigation ensued, which resulted in a material amount of offsetting legal expenses.

20. As to the Total Company Royalties metric, the Committee made certain other adjustments for the calculation of vesting. First, as the Minutes reflect, the Committee noted that Rave "recognized $230k of International royalty revenue," but "[d]uring the Company's audit more than $250k of the revenue was written off due to continued unsuccessful attempts to collect it." The $250k written off was thus "excluded from total Pizza Inn royalties and Rave Total Company Royalties." The accounting for the uncollectable International royalty revenue did not occur by revenue "reversal," but instead by a write off of the associated accounts receivables. Therefore it was necessary for the Committee to make an adjustment in its measurement of Total Company Royalties to address the non-existent International royalty revenue. Second, the Committee noted the termination of the Clairday area development agreement resulted in $140,000 in revenue, even though it was an "unbudgeted, non-operating item that did not represent actual growth in the Pizza Inn franchise system." That royalty revenue was thus deducted from the starting total Rave Total Company Royalties.

21. Attached to this Declaration as Exhibit 18 is a true and correct copy of the Minutes of the Compensation Committee of the Board of Directors of Rave Restaurant Group, Inc. for its meeting on September 1, 2020. The Committee did not formally evaluate RSUA Agreement vesting for the RSUA Agreements granted in FY2018 and tied to FY2020 performance because, after the hiring of a new CEO and subsequent departures and new hires, none of the employees who had received such RSUA Agreement units were still employed. Nonetheless, given the effects of the COVID-19 pandemic the performance metrics applicable to Crane's RSUA Agreement units (Adjusted EBITDA and Total Franchise Royalties) were not met at the minimum level for vesting. Further, the Compensation Committee did not grant any exceptions from the requirement that one remain continuously employed through the vesting date of the RSUA Agreements granted in FY2018 and tied to FY2020 performance, or any other RSUA Agreements.

**DECLARATION OF MARK E. SCHWARZ – Page 4**

22.     Attached to this Declaration as Exhibit 19 is a true and correct copy of excerpts of Rave's publicly-filed SEC Form 10-K report for Rave's FY2020, which sets out certain financial results and reports about the company for that period.

23.     Attached to this Declaration as Exhibit 20 is a true and correct copy of excerpts of Rave's Support Center Employee Handbook.

24.     The Compensation Committee Minutes, Actions, and Exhibits attached to this Declaration as Exhibits 7, 8, 11, 16, 17, and 18, and the emails attached to this Declaration as Exhibits 10, 12, and 13 are all records that are kept by Rave in the regular course of business, and it was the regular course of business of Rave for a representative of Rave with knowledge of the act, event, condition, or opinion, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, or opinion. The records attached hereto are the original or exact duplicates of the original.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 18, 2020, in Dallas, Texas.

_____
Mark E. Schwarz