# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SCOTT CRANE, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No.  4:20-CV-0013 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| RAVE RESTAURANT GROUP, INC., | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant's Motion for Summary Judgment on Threshold Contractual Issues (Dkt. #36).  Having considered the motion and the relevant pleadings, the Court finds that the motion should be granted in part and denied in part.

## BACKGROUND

In 2016, Rave Restaurant Group, Inc., ("Rave") was searching for a chief executive officer ("CEO") for two of its pizza restaurant brands: Pizza Inn and Pie Five Pizza. Rave decided to interview Scott Crane ("Crane") for the position. Crane interviewed with Mark E. Schwarz ("Schwarz") and another member of the board of directors, Clinton Coleman. Schwarz offered Crane a salary with potential bonuses and shares in Rave based on certain performance metrics (Dkt. #36, Exhibit 1 ¶ 4; Exhibits 2–4). Crane is a signatory to his employment agreement (the "Employment Agreement") and multiple Restricted Stock Unit Awards ("RSUA") Agreements.

Crane claims he was instrumental in fixing Rave's balance sheets and that he met the benchmarks set by Rave's board of directors, thus entitling him to approximately 328,000 shares for the 2016 fiscal year; 300,000 shares for the 2017 fiscal year; and 300,000 shares for the 2018 fiscal year (Dkt. #41, Exhibit 1 ¶¶ 16–18).

In July 2019, approximately one month after Crane claims he reached the benchmarks for fiscal year 2018, Schwarz terminated Crane and cited no reason for the termination (Dkt. #41, Exhibit 1 ¶¶ 18–19).[1] Rave notes that it terminated Crane without invoking the termination for cause provision of Crane's Employment Agreement, but Rave also stated the termination came after Crane proposed becoming a part-time CEO at a reduced pay (Dkt. #37 at. p. 15). Crane refused to sign the severance agreement that did not include the stock transfer he claims to have earned. Crane claims Rave failed to transfer the shares he earned, refused to pay his bonus, refused to compensate him for his earned but unpaid vacation, did not pay him $300,000 in severance pursuant to the employment contract, and did not pay his COBRA premium payments.

On January 6, 2020, Crane brought this suit bringing claims for breach of contract, fraudulent inducement, and seeking a declaratory judgement (Dkt. #1).[2] On November 27, 2020, Rave filed this Motion for Summary Judgment (Dkt. #36), and Crane filed his Response on December 23, 2020 (Dkt. #41). On January 7, 2021, Rave filed its Reply (Dkt. #44), and Crane filed a Sur-Reply on January 12, 2021 (Dkt. #46).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a

---

[1] In its Motion for Summary Judgment, Rave provides a section titled "Statement of Undisputed Material Facts" (Dkt. #36 at p. 8). Crane does not dispute the factual accuracy of Rave's statements of undisputed material facts (Dkt. #41 at p. 6).
[2] In his complaint Crane also seeks a claim for statutory fraud. However, Crane concedes that summary judgment is appropriate for his claim for statutory fraud (Dkt. #41 at pp. 27–28).

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  Substantive law identifies which facts are material.  *Id.*  The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49).  A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden.  Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson*

*v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)).  The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

### I. Choice of Law

As a threshold matter, Crane begins his Response with a discussion of conflicts of laws. He claims that Rave bears the burden of establishing which law applies but does not provide any briefing on why he thinks Missouri or Kansas law should be applied. Crane argues Rave failed to establish the law that applies to the RSUA Agreements and the 2015 Long Term Incentive Plan ("LTIP"), and thus the Court may dismiss the Motion (Dkt. #41 at p. 8).

Crane notes that unlike the Employment Agreement, neither the RSUA Agreements nor the 2015 LTIP contain a choice of law provision (Dkt. #41 at p. 7). In Crane's view, either Missouri law or Kansas law should apply to the RSUA Agreements and the 2015 LTIP because Rave is a Missouri corporation and Crane is a resident of Kansas. Crane alleges that Missouri and Kansas impose a duty of good faith on contractual parties whereas Texas does not (Dkt. #41 at p. 8).[3]

In supporting his position that the Court should dismiss the Motion in its entirety, Crane cites to *IntelliGender, LLC v. Soriano*, which is an unpublished case from this District. 2:10-cv-125-TJW, 2011 WL 903342 (E.D. Tex. Mar. 15, 2011). *Soriano* is not binding on this Court, and the facts of the case are distinguishable. Further, Crane has not pointed the Court to—and the Court has not found—any Fifth Circuit precedent that would require the Court to dismiss the Motion in

---

[3] The Court emphasizes that Crane does not dispute that Texas law governs the Employment Agreement, but rather his argument is confined only to the RSUA Agreements and the 2015 LTIP. The Court's analysis regarding the alleged conflict of law issue is equally confined to the RSUA Agreements and the 2015 LTIP.

its entirety when Rave—the movant—did not brief the Court on which law should apply in its Motion. Consequently, the Court will not dismiss the Motion in its entirety as Crane requests.

Here, neither Rave nor Crane properly or fully brief the conflict of law issue.[4] But even without the issue properly and fully briefed, the Court does not believe there is a conflict of laws issue. Rave argues there is no conflict of laws issue because both Missouri and Kansas hold that a duty of good faith cannot be used to contradict the express terms of the agreement (Dkt. #44 at p. 6). The Court agrees. *See Bishop & Associates, LLC v. Ameren Corp.,* 520 S.W.3d 463, 471 (Mo. 2017) ("[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.") (internal quotation omitted); *First Nat. Bank of Omaha v. Centennial Park, LLC,* 303 P.3d 705, 716 (2013) ("Under Kansas law, '[t]he duty of good faith and fair dealing is implied in every contract, with the exception of employment-at-will contracts.'") (citing *Estate of Draper v. Bank of Am., N.A.,* 205 P.3d 698, 710 (2009)). The contracts at issue here—as discussed below—contains express provisions allowing the Parties to take specific action in accordance with the provisions. Further, the Parties entered into an at-will employment relationship with a clause permitting termination at will for any reason.[5] Because the relevant contracts contain express provisions, and based on the Court's independent research, the Court does not believe there is a conflict of law issue.

---

[4] Generally, the Court would not consider arguments raised for the first time in a reply brief. *See Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989) (refusing to entertain arguments raised for the first time in appellant's reply brief); *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991) (district court following the "court's practice of declining to consider arguments raised for the first time in a reply brief"); *RedHawk Holdings Corp. v. Schreiber Tr. of Schreiber Living Tr. - DTD 2/8/95*, 836 F. App'x 232, 235 (5th Cir. 2020) (recognizing the Fifth Circuit Court of Appeals and district courts of the Fifth Circuit do not review arguments raised for the first time in a reply brief).

     The Court notes that Rave provided some briefing on the issue for the first time in its Reply. Arguing the issue in the Reply, however, did not adequately provide Crane with a fair opportunity to brief the issue and present his arguments to the Court. Accordingly, the Court finds the issue was not fully and properly briefed for the Court.

[5] *See infra* § II.

Even if Missouri or Kansas law were to apply instead of Texas law, the Court does not see how this would dictate a different outcome. The facts of this case indicate that the implied duty of good faith would not be applicable to the RSUA Agreements or the 2015 LTIP, which lack a choice of law provision. And without the implied duty of good faith, the result would not differ from applying Texas law. Consequently, the Court does not find that there is a conflict of laws issue, and the Court will proceed with its analysis under the assumption that Texas law is applicable.[6]

## II. Contractual Claims

The parties disagree on whether there was a breach of the contract. Generally, the Employment Agreement outlines Crane's salary, incentive compensation through separate RSUA Agreements, annual incentive compensation through an annual bonus opportunity, employee benefits including vacation, and severance payments in the case of termination under various situations (Dkt. #36, Exhibit 6).

Establishing a breach of contract requires a showing that "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).[8]

Within the Employment Agreement and the separate RSUA Agreements, there are multiple disagreements on the application of the provisions. The "Long Term Incentive Compensation"

---

[6] The Court is not foreclosing the possibility that another state's law could apply to aspects of the claims at issue here. If the disagreement as to what law applies persists, before trial the Parties should fully brief the Court on the differences in Missouri, Kansas, and Texas law and present their arguments as to why one state's laws should apply over the others.

[8] Based on the Court's resolution of the conflict of law issue in section I, the Court will proceed with its analysis by applying Texas law.

paragraph of the January 6, 2017, Employment Agreement addressed Restricted Stock Unit

awards. That paragraph states in full as follows:

> As additional consideration for the duties and responsibilities to be performed, you
> will be eligible to participate in the Long Term Incentive Plan (the "LTIP"), which
> currently consist of Restricted Stock Unit (RSU) awards with 3-year performance
> and time vesting criteria, as determined by the Company's Compensation
> Committee each year. Upon your start date with the Company, you will be granted
> 300,000 Restricted Stock Units. The terms and conditions associated with the RSUs
> are detailed in a separate Restricted Stock Unit Award Agreement. You shall be
> eligible for additional LTIP awards following each full fiscal year that you are
> employed by the Company, subject to approval of the Compensation Committee.

(Dkt. #36, Exhibit 6 at p. 3).

Pursuant to the Employment Agreement's provision for a grant of 300,000 Restricted Stock

Units on his start date, Crane and Rave executed a RSUA Agreement dated January 12, 2017

("2017 RSUA Agreement") (Dkt. #36, Exhibit 7 at p. 2). The 2017 RSUA Agreement contained a

vesting date of October 15, 2019, and it contained certain performance criteria, which must have

been met before the shares would vest (Dkt. #36, Exhibit 7 at p. 2). Further, the shares that would

be distributed pursuant to the 2017 RSUA Agreement were subject to all the terms and conditions

of the Pizza Inn Holdings, Inc. 2015 LTIP (Dkt. #36, Exhibit 7 at p. 2).

In the section titled "Grant of Restricted Stock Units," the RSUA Agreement Terms and

Conditions explained that a "Unit" represents a "right to receive one share . . . of the Company []

subject to satisfaction of the vesting schedule, performance criteria and other conditions set forth

herein." (Dkt. #36, Exhibit 7 at p. 3). Directly below is the heading titled "Vesting," which states

in full, "[t]he Units will become fully vested and nonforfeitable if (i) [Crane] remains continuously

employed by [Rave] through the Vesting Date indicated in this Agreement, or vesting is

accelerated as provided herein, and (b) [sic] the number of Units to be vested pursuant to the performance criteria set forth in Exhibit A is greater than zero." (Dkt. #36, Exhibit 7 at p. 3).[9]

In the "Performance Criteria" section, the RSUA Agreement Terms and Conditions note that the "number of shares issuable with respect to each Unit shall be determined by the Committee based on the performance criteria set forth in Exhibit A hereto." (Dkt. #36, Exhibit 7 at p. 3). That attached Exhibit A said that (a) the performance criteria would be measured against Rave's Fiscal Year 2019 financial performance, and (b) Rave's performance relative to the criteria would be determined by the Compensation Committee (Dkt. #36, Exhibit 7 at p. 3).

Section 5 titled "Forfeiture of Units" explains that "[a]ll unvested Units will be forfeited in the event [Crane] ceases to be an employee of [Rave] before the Vesting Date for any reason . . ." (Dkt. #36, Exhibit 7 at p. 4).

Section 10 titled "No Rights of a Stockholder or of Continued Employment" states that "nothing herein shall confer upon [Crane] any right to remain in the employ of [Rave]" (Dkt. #36, Exhibit 7 at p. 5).

As mentioned above, the 2017 RSUA Agreement was subject to the 2015 LTIP. In relevant part, the 2015 LTIP states in section 14 titled "Termination of Employment" that "if an employee to whom restricted stock units have been awarded ceases to be an employee of the Corporation or of a subsidiary prior to vesting of all such restricted stock units and the satisfaction of any other conditions prescribed by the Committee for any reason other than death, total and permanent disability . . . , or retirement from employment at or after the Retirement Age, the employee shall immediately forfeit all unvested restricted stock units" (Dkt. #36, Exhibit 5 at p. 13).

---

[9] The Court notes that the "Vesting" provision starts a two-part list with the first item being labeled as "(i)" and the second item labeled as "(b)." For the purposes of clarity, the Court will continue to refer to the provisions as "(i)" and "(b)."

On December 29, 2017—during Rave's Fiscal Year 2018—Rave granted Crane a second RSUA Agreement ("2018 RSUA Agreement") (Dkt. #36, Exhibit 10 at p. 2). This RSUA Agreement explained that it granted Crane 266,667 units with a "Vesting Date" of "October 15, 2020" and noted certain new "Performance Criteria" (Dkt. #36, Exhibit 10 at p. 2). Other than those terms, the 2018 RSUA Agreement had the same Terms and Conditions as the 2017 RSUA Agreement.[10]

### A. Stock

Crane brings a breach of contract claim alleging Rave breached the Employment Agreement when it failed to transfer shares of the company to Crane. Rave asserts that Crane's claim for the shares of the company fails as a matter of law. Specifically, Rave argues that there was no breach because Crane had no right to the unvested stock and that when Crane was terminated, all the unvested stock was then forfeited (Dkt. #36 at p. 17). Crane counters by stating there was a condition precedent to receive the shares, and because Rave made the condition precedent impossible to perform, the condition should be excused.

Interpreting a contract is a question of law the Court must decide.  *Colony Ins. Co. v. Custom Ag Commodities, LLC*, 272 F. Supp. 3d 948, 956 (E.D. Tex. 2017); *Lubbock Cnty. Hosp. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 143 F.3d 239, 241–42 (5th Cir. 1998). To begin, the Court "must ascertain the true intentions of the parties as expressed in the writing itself." *Kachina Pipeline Co. Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). "This analysis begins with the contract's express language." *Murphy Expl. & Prod. Company-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018). "A contract's language is given its 'plain, ordinary, and

---

[10] For the sake of brevity, the Court will collectively refer to the 2017 RSUA Agreement and the 2018 RSUA Agreement as the "RSUA Agreements" and only cite to the 2017 RSUA Agreement unless the terms differ.

generally accepted meaning unless the instrument directs otherwise.'" *Alicea v. Curie Bldg., L.L.C.*, 08-19-00235-CV, 2021 WL 614794, at *8 (Tex. App.—El Paso Feb. 17, 2021, no pet. h.) (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018)).

"If the Court determines that the language 'can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous[,] and we will construe it as a matter of law.'" *Id.* (quoting *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). "However, if the provision contains more than one reasonable interpretation, it is ambiguous and creates an issue of fact." *Id.* (citing *Barrow-Shaver,* 590 S.W.3d at 479). "A contract is not ambiguous simply because the parties differ on a term's meaning; the competing definitions must be reasonable for an ambiguity to exist." *Id.* (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).

In this case, the RSUA Agreements provided the stock awards would be transferred after the units had vested (Dkt. #36, Exhibit 7 at p. 3). The units would not vest until October 15, 2019, for the 2017 RSUA Agreement so long as Crane remained employed with Rave (Dkt. #36, Exhibit 7 at pp. 2–3), and October 15, 2020, for the 2018 RSUA Agreement (Dkt. #36, Exhibit 10 at pp. 2–3). However, the RSUA Agreements contained a forfeiture provision that states "[a]ll unvested Units will be forfeited in the event [Crane] ceases to be an employee of the Company before the Vesting Date for any reason . . ." (Dkt. #36, Exhibit 7 at p. 4). The RSUA Agreements further state that they are subject to the terms and conditions of the 2015 LTIP (Dkt. #36, Exhibit 7 at p. 2). The 2015 LTIP contains a termination of employment provision that states Crane will forfeit all unvested restricted stock units if he ceases to be an employee for *any reason* (Dkt. #36, Exhibit 5 at p. 13).

### i. Condition Precedent

Crane argues that the Court should construe the contract in a manner that would prevent the forfeiture (Dkt. #41 at p. 9). In bringing this argument, Crane asks the Court to find there was a condition precedent and that Rave made it impossible for Crane to fulfill the condition precedent. Crane relies heavily on *Sellers v. Minerals Techs., Inc.*, in making his argument. 753 F. App'x 272 (5th Cir. 2018).

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (citations omitted); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract  comes due."). "Contract language that uses conditional language such as 'if,' 'provided that,' or 'on condition that,' reflects the parties['] intent to create a condition precedent." *C&C Rd. Constr., Inc. v. SAAB Site Contractors, L.P.*, 574 S.W.3d 576, 588 (Tex. App.—El Paso 2019, no pet.) (citing *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990)). "Because of their 'harshness in operation,' conditions precedent are generally not favored under Texas law and should not be recognized if 'another reasonable reading of the contract is possible' or the condition 'would impose an absurd or impossible result.'" *Sellers*, 753 F. App'x at 277 (quoting *Criswell*, 792 S.W.2d at 948).

Here, there is a condition precedent. Section 2 of the 2017 RSUA Agreement notes that "[t]he Units will become fully vested and nonforfeitable *if* (i) Participant remains continuously employed by the Company through the vesting date . . ." (Dkt. #36, Exhibit 7 at p. 3) (emphasis added). This clause contains the "if" conditional language that is necessary for creating a condition precedent, and the Court interprets the language as doing just that.

11

Section 2 of the RSUA Agreements unambiguously creates a condition precedent that required Crane to be employed through October 15, 2019—for the 2017 RSUA Agreement—and October 15, 2020—for the 2018 RSUA Agreement—to have the stock units vest. Thus, for Crane to be entitled to the stock units, the condition must either have been satisfied or qualify for having its fulfillment excused.

In *Sellers*, the Fifth Circuit provided guidance for cases similar to the one here. The Fifth Circuit stated, "[e]ven if the condition precedent was not technically met here, however, we find it appropriate under the circumstances of this case to deem the condition fulfilled or excuse its fulfillment." *Sellers*, 753 F. App'x at 278. In reaching this conclusion, the Fifth Circuit noted that "[u]nder Texas jurisprudence, if one party prevents another from performing a condition precedent or renders its fulfillment impossible, then the condition may be considered fulfilled." *Id.* (collecting cases). The Fifth Circuit determined that the defendants unilaterally prevented fulfillment of the condition at issue and cannot rely on nonfulfillment to deny the long-term incentive benefits. *Id.* at 279.

Looking to the guidance in *Sellers*, the Court finds that there is a genuine issue of material fact regarding why Rave terminated Crane and if the condition should be excused. In Texas, the non-performance of conditions precedent may be excused "if the condition's requirement 'will involve extreme forfeiture or penalty' and 'its existence or occurrence forms no essential part of the exchange for the promisor's performance.'" *Donaldson v. Digital Gen. Sys.*, 168 S.W.3d 909, 916 (Tex. App.—Dallas 2005, pet. denied) (quoting *Beard Family P'ship v. Commercial Indem. Ins. Co.,* 116 S.W.3d 839, 853–54 (Tex.App.—Austin 2003, no pet.)). "In addition, if one party prevents the other from performing a condition precedent, then the condition is 'considered as

fulfilled.'" *Id.* (citing *Hous. Cnty. v. Leo L. Landauer & Assocs., Inc.,* 424 S.W.2d 458, 464 (Tex. Civ. App.—Tyler 1968, writ ref'd n.r.e.).

For the restricted stock units to vest in accordance to the 2017 RSUA Agreement, Crane would have to be employed with Rave until October 15, 2019. There is a fact question regarding the reason Rave fired Crane and whether Rave's intent behind firing Crane was to prevent him from receiving the stock units. Further, Crane claims he had already met the performance benchmarks at the time he was terminated (Dkt. #41, Exhibit 1 ¶¶ 17–19). Even if Rave contends that Crane had not met the performance criteria, this disagreement poses a fact question better suited for the jury.[12]

The Court notes that Crane's employment was at-will and that the RSUA Agreements expressly stated that employment was not guaranteed and any unvested stock units would be forfeited if employment ceased for any reason before the vesting date. Rave asks the Court to enforce the plain intention of the language included in the RSUA Agreements. However, the Court will not read the selected clauses in isolation.

The Court finds it beneficial to understand the purpose of the RSUA Agreements and the LTIP. Under the Recitals of the RSUA Agreements, subsections "A" and "B" shed light on Rave's reasoning for including the RSUA Agreements. Subsection "A" says that "[Rave] desires that [Crane] remain in the employment of [Rave] and contribute to the growth and success of [Rave]." (Dkt. #36, Exhibit 7 at p. 3). Subsection "B" states as follows:

> The Committee has determined to grant to [Crane] restricted stock units in order to encourage [Crane] to remain in the employment of [Rave] and to contribute to the growth and success of [Rave] by affording [Crane] an opportunity to obtain an

---

[12] The Court notes that for the 2017 RSUA Agreement and the 2018 RSUA Agreement have different "Measurement Years" for the performance criteria. For the 2017 RSUA Agreement, the Measurement Year was the fiscal year ending in June 2019 (Dkt. #36, Exhibit 7 at p. 6). In the 2018 RSUA Agreement, the Measurement Year for the performance criteria was the fiscal year ending in June 2020 (Dkt. #36, Exhibit 10 at p. 7).

increased proprietary interest in [Rave] so as to assure a closer identification between [Crane's] interests and the interests of [Rave].

(Dkt. #36, Exhibit 7 at p. 3).

The LTIP states that Rave established the LTIP to:

(a) attract and retain key executive and managerial employees;

(b) motivate participating employees, by means of appropriate incentives, to achieve long-range goals;

(c) attract and retain well-qualified individuals to serve as members of the Corporation's Board of Directors (the "Board");

(d) provide incentive compensation opportunities that are competitive with those of other similar enterprises; and

(e) further identify the interests of directors and eligible employees with those of the Corporation's stockholders through compensation alternatives based on the Corporation's common stock, $0.01 par value per share (the "Common Stock");

and thereby promote the long-term financial interest of the Corporation, including the growth in value of the Corporation's equity and enhancement of long-term stockholder return.

(Dkt. #36, Exhibit 5 at p. 2).

It is clear from the language included in the LTIP and RSUA Agreements that the purpose was to encourage employees to stay with the company long term. This purpose appears to be frustrated when Rave terminates its employees before the incentives have had a chance to vest. Rave is asking the Court to recognize the "plain intention" of the language that says the unvested units will be forfeited upon Crane's termination for any reason but is asking the Court to ignore Rave's intent for having the RSUA Agreements and LTIP. Determining the Parties' intent is a question best left for the jury.

Rave terminated Crane without cause and unilaterally prevented fulfillment of the condition. At the summary judgment stage Rave cannot rely on nonfulfillment and establish as

14

a matter of law that Crane should be denied the restricted stock units he would otherwise be due if he were still employed. Though the result would be different had Rave cited a reason for cause when terminating Crane, viewing the facts as they are currently, the Court finds there is a genuine issue of material fact as to the Parties' intent and whether the performance criteria were already met. Summary judgment is denied as to the stock units.

### B. Bonus Payment

Rave next asks the Court to grant summary judgment on Crane's claim for earned and accrued bonuses (Dkt. #36 at p. 21). Specifically, Rave presents two arguments: (1) "the language of the bonus provision did not give Crane any contractual right to a bonus[,]" and (2) "Crane did not otherwise qualify for the bonus he seeks." (Dkt. #36 at pp. 21–23). Crane counters by stating a fact issue precludes summary judgment (Dkt. #41 at p. 16). Specifically, Crane argues the bonus provisions are contained in the contract and provide for mandatory duties on the part of Rave (Dkt. #41 at p. 16).

The bonus provision at issue is contained in the Employment Agreement under the heading "Annual Incentive Compensation" and provides as follows:

> In addition to your Base Annual Salary, you shall be eligible to participate in the Company's executive bonus plan, which is typically based on the Company's financial performance and strategic goals relative to targets set by the Board of Directors. The amount of bonus earned each year is subject to the approval of the Board of Directors, which may use its discretion to interpret the Company's achievement of the bonus targets and take into consideration unusual, one-time, or forward-looking factors that affected the Company's historical results or may affect the Company's future prospects. The annual bonus targets generally shall be set such that you shall earn a bonus of 100% of your base annual salary upon achievement of certain financial and strategic objectives, as determined by the Compensation Committee of the Company. Bonuses are typically not paid until the Company's financial audit is complete, and executives must remain employed by the Company until the bonus payment date to receive a bonus (unless otherwise provided for in this agreement).
>
> Your bonus for Fiscal Year 2017, ending on June 25, 2017, shall be $200,000.

(Dkt. #36, Exhibit 6 at p. 3).

Rave argues that the discretionary language in the Annual Incentive Compensation provision does not create a contractual right to a bonus payment. The Court agrees. The Annual Incentive Compensation provision clearly provides that Crane would be paid $200,000 for the Fiscal Year 2017 (Dkt. #36, Exhibit 6 at p. 3). The Annual Incentive Compensation provision does not, however, provide a contractual obligation to pay Crane any further bonuses.

The language in the Annual Incentive Compensation provision provides that Crane would be *eligible* to participate in the bonus plan (Dkt. #36, Exhibit 6 at p. 3). This language does not create a requirement to pay the bonus. *See Pride Intern., Inc. v. Bragg*, 259 S.W.3d 839, 848 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (finding language stating "shall be eligible to participate . . . in incentive compensation plans . . ." showed the employee was eligible to receive bonuses but that the language did not require that they be paid).

Crane does little to rebut Rave's argument. Crane argues that the bonus provisions are contractual and provide mandatory duties on Rave (Dkt. #41 at p. 16). The Court agrees that the word "shall" is mandatory and not discretionary, but Crane provides little analysis to flesh out any argument rebutting those presented by Rave.

The phrase "you shall be eligible to participate in the Company's executive bonus plan . . ." certainly reflects that is it mandatory that Crane be eligible to participate based on his position as CEO, but there is no language requiring a mandatory payout of bonuses other than for Fiscal Year 2017 (Dkt. #36, Exhibit 6 at p. 3). Crane is correct in showing that his bonus for Fiscal Year 2017 was $200,000, but it does not appear that he is arguing that he did not receive this bonus. Rather, Crane points out every location the word "shall" is used to show that the bonus was

mandatory. However, just because a provision contains the word "shall" does not mean the object of the provision—here, the executive bonus plan bonuses—is mandatory.

The Annual Incentive Compensation provision does use the word "shall" twice in another sentence in the provision. It states that the "annual bonuses targets generally shall be set such that you shall earn a bonus of 100% of your base salary upon achievement of . . ." (Dkt. #36, Exhibit 6 at p. 3). Reading this sentence, however, the word "shall" is used to describe how the performance criteria will be set and how stating that the bonus will be earned if certain criteria are met—here, financial and strategic objectives (Dkt. #36, Exhibit 6 at p. 3). The only location in the Annual Incentive Compensation provision that shows a mandatory bonus is required is in the last sentence for Fiscal Year 2017. No other language in the provision indicates that the bonus is mandatory without first meeting other criteria.

Still, Crane argues that Rave is not entitled to summary judgment as to the bonuses. Specifically, Crane argues that he met the performance and strategic goals at the time of his termination and is thus entitled to the bonus (Dkt. #41 at p. 18). Crane, however, fails to address Rave's point that to receive the bonus, Crane would have to have been employed with the company at the time the bonus was paid (Dkt. #36, Exhibit 6 at p. 3) (". . . executives must remain employed by the Company until the bonus payment date to receive a bonus (unless otherwise provided for in this agreement)"). The bonus for Fiscal Year 2019 had not yet been distributed at the time Crane was terminated, and Crane provides no evidence that he met the requirement in the provision stating the executive must still be employed with the company on the payment date to receive the bonus.

Rave did not breach this provision of the agreement because Crane was not owed a bonus for Fiscal Year 2019. Therefore, Rave is entitled to summary judgment for Crane's breach of contract claim for the bonus.

### C. Unpaid Vacation

Rave also asks the Court to grant summary judgment on Crane's breach of contract claim for unpaid vacation. Specifically, Rave claims there was no contractual right to be paid for earned but unpaid vacation time (Dkt. #36 at p. 23–24). Crane, however, says there is a contractual right to be compensated for the earned but unpaid vacation time (Dkt. #41 at p. 19).

The provision at issue titled "Employee Benefits" provides as follows:

> During the Initial Term and any Extended Term while you are employed by the Company, you will be entitled to receive the same benefits as the Company makes generally available from time to time to the Company's senior executives, as those benefits may be modified, reduced or eliminated from time to time. Vacation . . . will be available to you as set forth in the Company's standard benefit package and *Employee Handbook*. Such rights, programs and benefit plans may be revised from time to time at the Company's sole discretion . . . . The Company agrees to allow you four weeks of paid time off plus four "Extra Days" as described in the Company's *Employee Handbook.* With the exception of any contrary provision in this letter, or in any other document or agreement between you and the Company, the terms of your employment are at all times subject to the provisions of the Company's *Employee Handbook,* as said *Handbook* may be changed from time to time by the Company in its sole discretion.

(Dkt. #36, Exhibit 6 at p. 6). The Court can resolve this issue without deciding whether this provision is illusory.

To begin, the question is not whether Crane was ever entitled to have paid time off but rather whether he is entitled to compensation at the time of termination for accrued, but not yet used, paid time off. The "Employee Benefits" provision states that the benefits are subject to Rave's employee handbook (Dkt. #36, Exhibit 6 at p. 6). The employee handbook states "[p]ayment for accrued but unused vacation at termination may or may not be made unless required by law." (Dkt. #36, Exhibit 21 at p. 7).

In Texas, "[paid time off] . . . is payable to an employee upon separation from employment only if a written agreement with the employer or a written policy of the employer specifically provides for payment." 40 Tex. Admin. Code § 821.25(g) (2021) (Tex. Workforce Comm'n, Texas PayDay Rules). Here, Rave did not specifically provide for payment of paid time off at termination. The relevant provision in the employee handbook states that payment for the accrued but unused vacation at termination may or may not be made unless required by law (Dkt. #36, Exhibit 21 at p. 7). Because there is no policy specifically providing for the payment of accrued but unused vacation days, Crane is not entitled to such payment. Therefore, the Court grants summary judgment on Crane's breach of contract claim for vacation days.

### D. COBRA Premiums and Severance Pay

Rave asks the Court to grant summary judgment on Crane's claims for COBRA premiums and severance pay. Specifically, Rave claims that the Employment Agreement states Crane would only be entitled to severance pay and COBRA premiums if he executed a release—which Rave claims Crane never did. Crane claims there is a fact issue precluding summary judgment on his claim to severance and COBRA premiums.

The relevant provision titled "Termination of Employment" is as follows:

> Prior to the expiration of the Initial Term or any Extended Term, the Company may terminate your employment at any time for Cause or without Cause . . . .
> If (i) the Company terminates your employment Without Cause . . . and (ii) you have executed a full, complete, and binding release of the Company from any and all liabilities arising in connection with your employment by the Company or the termination thereof, on a form acceptable to the Company, then you will be entitled to severance compensation and benefits as follows:
> (1) Termination By Rave Restaurant Group Without Cause or Resignation By You For Good Reason, in Each Case Without a Change In Control: In such an instance, you will receive:
> •The continued payment of your Base Annual Salary for the duration of the Severance Period . . . .

> • For the duration of the Severance Period, group health insurance coverage at least equal to that which would have been provided to you if your employment had not been terminated or, at the Company's election, payments for the applicable COBRA premium for such coverage . . . .

(Dkt. #36, Exhibit 6 at pp. 4–5) (emphasis added). The underlined portion above is at the center of the disagreement. Rave claims that Crane never executed a release, so he is not entitled to the benefits. In his declaration, Schwarz stated "Crane did not sign Rave's proposed release. He instead returned a copy with additional provisions unacceptable to Rave added to the Separation Agreement that Rave had tendered." (Dkt. #36, Exhibit 1 ¶ 16). According to Schwarz, the company provided Crane with a Separation Agreement (Dkt. #36, Exhibit 15), but Crane returned the Separation Agreement with handwritten alterations (Dkt. #36, Exhibit 16).

The handwritten modifications were intended to provide Crane with the Restricted Stock Units he would have been eligible for had he continued to be employed with Rave and had he met the performance criteria (Dkt. #36, Exhibit 16). Rave did not believe Crane was entitled to the Restricted Stock Units and refused to accept the release as modified.

Crane claims the release he returned with the handwritten modifications was reasonable and should have been accepted by Rave (Dkt. #41 at p. 24); *see also* (Dkt. #41, Exhibit 1 ¶ 23) (Crane's Declaration stating "[t]he form of release I provided to Rave with my handwritten revisions . . . , and which the Company refused to sign, was reasonable under the circumstances."). Crane argues the Court should read the word "reasonably" into the provision so the requirement would state that the form must be "reasonably acceptable to the Company" (Dkt. #41 at p. 21).

Certainly, the Court agrees with the *Fischer* case that courts may imply terms that can reasonably be implied. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). But here, Crane is asking the Court to rewrite portions of Employment Agreement. Crane is not simply asking the Court to find that his handwritten modifications were acceptable—Crane is also asking the Court

to find that Crane's requests and modifications were also reasonable. The Employment Agreement clearly set out what Crane would be entitled to if he executed a full release. Those benefits include the COBRA premiums and severance pay. However, Crane did not execute a release that complied with the language of the Employee Agreement. His modifications did not comport with the requirements in the Employee Agreement, and consequently, Rave and Crane never reached an agreement on the release.

Crane also makes other arguments regarding Securities and Exchange Commission ("SEC") whistleblower claims, but the Court does not find them persuasive. Crane has not alleged any SEC violations, nor are his claims related to the cases he cites. In summary, because Crane did not execute a release that complied with the Employee Agreement, he is not entitled to COBRA premiums or severance pay.

**III. Fraudulent Inducement**

Rave asks the Court to grant summary judgment on Crane's claims for fraudulent inducement. Specifically, Rave claims (1) Crane disclaimed reliance on matters before the Employment Agreement; (2) Crane cannot establish the reliance element of a fraud claim; (3) Crane cannot show that Rave had no intention of performing under the Employment Agreement; and (4) Crane cannot show causation for an injury. Crane responds by stating Rave's merger clause does not entitle it to judgment as a matter of law and that Rave has not established Crane's reliance was unreasonable as a matter of law.

Fraudulent inducement arises in the context of a contract, and it "is a species of common-law fraud that shares the same basic elements: (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which

caused injury." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). "Fraudulent inducement is actionable when the misrepresentation is a false promise of future performance made with a present intent not to perform." *Id.* (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)).

### A. Disclaimer Clause

Rave claims that Crane disclaimed any reliance he had when he signed the Employment Agreement. The "Acceptance" provision at issue reads as follows: "Any representations that may have been made to you concerning the terms or conditions of employment, whether orally or in writing, are cancelled and superseded by this letter." (Dkt. #36, Exhibit 6 at p. 9). Crane contends that this provision is a pure merger clause and not an adequate waiver of his right to bring a claim for fraudulent inducement.

"The question of whether an adequate disclaimer of reliance exists is a matter of law." *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 333 (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)). Under Texas jurisprudence, a plaintiff can maintain a claim for fraudulent inducement even if there is a merger clause when the clause does not mention reliance or waive claims for fraudulent inducement. *Italian Cowboy Partners, Ltd.* 341 S.W.3d at 334. The Court agrees with Crane—the provision here was a merger clause and not a waiver of reliance.

To begin, the Court notes that the parties included only one sentence acting as a merger clause and not more substantial standalone provisions that Texas courts have upheld in the past. For example, in *Schlumberger*, the contract provided, "[N]one of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment . . . ." 959 S.W.2d at 180. In *Forest Oil Corp. v. McAllen,* the contract stated

that "in executing the releases contained in this Agreement, [the parties are not] relying upon any statement or representation of any agent of the parties being released hereby. [We are] relying on [our] own judgment . . . ." 268 S.W.3d 51, 54 n.4 (Tex. 2008). In these two cases, the intent to disclaim reliance was clear from the language of the contract. Such specific language is absent from Rave and Crane's Employment Agreement.

Then language from the Employee Agreement is more akin to that of the lease agreement in *Italian Cowboy*. There, the provision provided that "neither Landlord nor Landlord's agents, employees or contractors have made any representations or promises with respect to the Site, the Shopping Center or this Lease except as expressly set forth herein," and that "this lease constitutes the entire agreement between the parties hereto with respect to the subject matter hereof." *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 335. Further, similar to *Italian Cowboy*, where the Employment Agreement represents the initiation of a business relationship, the agreement "should be all the more clear and unequivocal in effectively disclaiming reliance and precluding a claim for fraudulent inducement . . . ." *Id.* Here, the language in the Employment Agreement does not clearly and unequivocally disclaim reliance, and thus does not defeat Crane's claim for fraudulent inducement.

After a careful review of the record and the arguments presented, the Court is not convinced that Rave met its burden demonstrating that there is no material issue of fact as to Crane's claim of fraudulent inducement. Accordingly, as to Crane's claim for fraudulent inducement, the Court denies Rave's Motion for Summary Judgment.

## CONCLUSION

It is therefore **ORDERED** Defendant's Motion for Summary Judgment on Threshold Contractual Issues (Dkt. #36) is hereby **GRANTED in part and DENIED in part.** Specifically, Crane's breach of contract claim for bonus payment, unpaid vacation, and severance pay or COBRA premiums, and the statutory fraud claim are dismissed with prejudice. The Motion is denied as to all remaining claims.

**IT IS SO ORDERED.**

**SIGNED this 4th day of August, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE